The BOARD OF PUBLIC INSTRUCTION OF DUVAL COUNTY, FLORIDA, Appellant,

v.

Daly BRAXTON and Sharon Braxton, minors, etc., et al., Appellees.

No. 25479.

United States Court of Appeals Fifth Circuit.

Aug. 29, 1968.

Leroy D. Clark, William L. Robinson, New York City, J. Harold Flannery, Atty., Dept. of Justice, Washington, D. C., for appellees.

Before WISDOM and COLEMAN, Circuit Judges, and RUBIN, District Judge.

WISDOM, Circuit Judge:

■ In United States v. Jefferson County Board of Education[1] this Court, sitting en banc, gave a qualified approval to so-called "freedom of choice" plans for desegregating public schools. We noted that the "method has serious shortcomings" and suggested a decree to attempt to overcome these shortcomings.[2] We pointed out that a freedom of choice plan is "[only] a means to an end".[3] It is "but one of the tools available to school officials *at this stage* of the process of converting the dual system of separate schools for Negroes and whites into a unitary system".[4] (Original emphasis.) We observed, *"The only school desegregation plan that meets constitutional standards is one that works".*[5] (Original emphasis.) School boards "have the affirmative duty under the Fourteenth Amendment" to find a desegregation plan that does work.[6] Cf. Green v. School Board of New Kent County, 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716.

In this case the Board of Public Instruction of Duval County, Florida, combined a geographic attendance zone sys-

Elliott Adams, Jacksonville, Fla., for appellant.

1. United States v. Jefferson County Board of Education (Jefferson I), 5 Cir. 1966, 372 F.2d 836, adopted with clarifications on rehearing en banc (Jefferson II), 1967, 380 F.2d 385, cert. denied sub. nom. Caddo Parish School Board v. United States, 1967, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103.

2. We added: "Indeed, the 'slow pace of integration in the Southern and border States is in large measure attributable to the manner in which free choice plans * * * have operated' [Rep. U.S. Comm. on Civil Rights, Survey of Desegregation in the Southern and Border States—1965–66, p. 51]. When such plans leave school officials with a broad area of uncontrolled discretion, this meth-

od of desegregation is better suited than any other to preserve the essentials of the dual school system while giving paper compliance with the duty to desegregate." Jefferson I, 372 F.2d at 888.

3. Jefferson II, 380 F.2d at 390.

4. Id.

5. Jefferson I, 372 F.2d at 847. Cf., "The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now*". (Emphasis in the original.) Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1694.

6. Jefferson II, 380 F.2d at 389.

tem with freedom of choice. On principle, the combination would seem to be an improvement over unadulterated freedom of choice.[7] But the Duval County plan did not work. It resulted only in token desegregation. In particular, the Board's policy of permitting minority-to-majority transfers pointed toward resegregation. The district judge was fully aware of the history of the litigation, the ineffectiveness of the plan, and the Board's lack of enthusiasm for its affirmative duty to desegregate. He issued a decree containing the following provision for majority-to-minority transfers:

> B. Minority Transfer Policy. The defendants shall on request permit any student to transfer from a school where students of his race are a majority to any other school within the system where students of his race are in a minority, and they may assign students on such basis.

■ Duval County School Board attacks this portion of the decree as racially discriminatory. We hold that this provision is a constitutionally valid and appropriate step toward "disestablishing" the dual system of segregated schools that prevails in Duval County.

7. In Singleton v. Jackson Municipal Separate School District, 5 Cir. 1966, 355 F.2d 865, 871, we characterized freedom of choice as a "haphazard basis" for administering public school. More recently a district court that has had considerable experience with school desegregation observed: "If this Court must pick a method of assigning students to schools within a particular school district, barring very unusual circumstances, we could imagine no method more inappropriate, more unreasonable, more needlessly wasteful in every respect, than the so-called 'free-choice' system. * * * Under a 'free-choice' system, the school board cannot know or estimate the number of students who will want to attend any school, or the identity of those who will eventually get their choice. Consequently, the board cannot make plans for the transportation of students to schools, plan curricula, or even plan such things as lunch allotments and schedules; moreover, since in no case except by purest

I.

December 6, 1960, the Negro plaintiffs filed their original complaint asking for desegregation of public schools in Duval County (Jacksonville and its suburbs). After procedural preliminaries, the district court ordered the Board to present a desegregation plan by October 1962. The Board attacked the provisions of the desegregation order (1) prohibiting the assignment of teachers and staff on a racial basis and (2) prohibiting the Board's "approving budgets, making available funds, approving employment contracts and construction programs" to "maintain or support a school system operated on a racially segregated basis". We affirmed the judgment below. Board of Public Instruction of Duval County, Florida v. Braxton, 5 Cir. 1964, 326 F.2d 616.

The Board's plan established geographical school attendance areas for the assignment of children in desegregated grades of Duval County's schools. It provided for desegregation of grades one to six by the 1966–67 school year and one grade each year thereafter until the process was completed.

March 19, 1965, plaintiffs filed a Motion for Further Relief alleging that (1)

coincidence will an appropriate distribution of students result, and each school will have either more or less than the number it is designed to efficiently handle, many students at the end of the free-choice period have to be re-assigned to schools other than those of their choice— this time on a strict geographical-proximity basis, see the Jefferson County decree, thus burdening the board, in the middle of what should be a period of firming up the system and making final adjustments, with the awesome task of determining which students will have to be transferred and which schools will receive them. Until that final task is completed, neither the board nor any of the students can be sure of which school they will be attending; and many students will in the end be denied the very 'free choice' the system is supposed to provide them". Moses v. Washington Parish School Board, E.D. La.1967, 276 F.Supp. 834.

the pace of desegregation was too slow, (2) the zones were drawn so as to perpetuate segregation, and (3) students were being permitted to transfer from their assigned zones so as to perpetuate segregation. After a hearing November 3 and 4, 1965, and argument February 5, 1966, the Court, January 24, 1967, issued its order and findings of facts. The Court found:

In September of 1965, approximately 118,000 students, of which about 30,-000 were Negro, were enrolled in the public schools of Duval County, Florida. Approximately 137 Negro students were attending 12 previously all white schools. No white student attended any Negro school.

The Court also found that:

(1) In a number of instances, the attendance areas were so defined that they absolutely prevented any desegregation, or only the most token integration.

(2) Appellants made no initial assignments of white or Negro students to schools attended only or primarily by students of the opposite race. White students residing in the district or attendance area of Negro schools were not required to attend such schools, but they were assigned to, or freely permitted transfers to, other white schools. Similarly, Negro students residing in the district or attendance area of white schools were not required to attend such schools, but were assigned to, or freely permitted transfers to, other all-Negro schools.

(3) Appellants maintained certain inferior and inadequate school facilities for Negro students.

The district court entered a decree substantially similar to the decree this Court approved in *Jefferson*, except for modifications to reflect the fact that the Duval County Board initially assigned students by zones. The assignment provisions of the order are as follows:

### I-Attendance Zones

Commencing with the 1967–68 school year, a single system of non-racial attendance zones shall be established for all grades. Zone boundaries or feeder patterns designed or used to perpetuate or promote segregation shall be discontinued, and such zone lines shall be redrawn, wherever feasible, to maximize desegregation or eliminate segregation. No zone boundaries or feeder patterns which maintain what is essentially a segregated school structure shall be used.

### II-Assignment to School in Zone of Residence

Regardless of any previous attendance at another school, each student must be assigned to the school serving his zone of residence, and may be transferred to another school only in those cases which meet the following requirements:

A. Transfer for Special Needs. A student who requires a course of study not offered at the school serving his zone, or who is physically handicapped, may be permitted upon his written application, to transfer to another school which is designed to fit, or offers courses for, his special needs.

B. Minority Transfer Policy. The defendants shall on request permit any student to transfer from a school where students of his race are a majority to any other school within the system where students of his race are a minority, and they may assign students on such basis.

February 3, 1967, the Board moved for a new trial contending that the minority transfer provision was "contrary to the law [in that] it affirmatively imposes a discrimination by race as a criterion for transfer". The plaintiffs filed a new Motion for Further Relief alleging that defendants had failed to comply with the January 24th order in that they had not redrawn the gerrymandered attendance zone lines.

The court conducted hearings August 10 and 11, 1967, on both motions. In an order entered on August 22, 1967, the court treated the appellants' Motion for New Trial as one for modification

or clarification and amended its prior order in several respects but left standing its earlier order that the Board permit majority to minority transfers.

In the same order the court granted appellees' later Motion for Further Relief. The court found:

(1) As indicated in the Affidavit of Robert L. Varn, filed herein February 3, 1967, * * * It does not appear that a general realignment of zone boundaries and feeder patterns has been undertaken as required by paragraph I-Attendance Zones * * * or that any attempt has been made to redraw lines to maximize desegregation or eliminate segregation.

\* \* \* \* \* \*

(5) It is convincing on the record before me that the defendant(s) * * * are either incapable or unwilling to undertake full and meaningful compliance with either the strict tenor or the broad objectives of the provisions of the January 24, 1967 order.

The court ordered that:

Defendants shall, without delay, request the assistance of the expert consultation of school administrators of the United States Department of Health, Education and Welfare, located at the University of Miami, under the South Florida Desegregation Center, for review of the system of assignment for the school year 1967–68 and subsequent years. Said study shall include revision of zone boundaries and feeder patterns, staff assignments, faculty assignments, new school construction, and Board practices generally with respect to desegregation of schools, all with a view to complete elimination of segregated schools and racially discriminatory practices in the operation of the Duval County School System.

After four years of court-ordered desegregation, 137 Negroes, .0045 percent of the Negro students, attended predominantly white schools. No whites attended predominantly Negro schools. The Duval Board makes no initial assignments of white or Negro students to schools attended only or predominantly by students of the opposite race. White and Negro students who reside in school districts containing schools where members of their race are a minority are not required to attend such schools. Instead, they are assigned to or freely permitted to transfer to schools where members of their race are a majority. It was in this context that the district court issued its desegregation order. It was apparent to the district court, as it is to us, that a unitary system could not be accomplished without using an alternative to freedom of choice that would take race into consideration in approving transfers. Although the majority-to-minority transfer policy necessarily takes race into consideration, the plan does not discriminate between races.

II.

Turning again to *Jefferson* II, we note that we said:

The Court holds that boards and officials administering public schools in this circuit have the affirmative duty under the Fourteenth Amendment to bring about an integrated, unitary school system in which there are no Negro schools and no white schools— just schools. * * * Freedom of choice is not a goal in itself. It is a means to an end. A schoolchild has no inalienable right to choose his school. A freedom of choice plan is but one of the tools available to school officials *at this stage* of the process of converting the dual system of separate schools for Negroes and whites into a unitary system. The governmental objective of this conversion is —educational opportunities on equal terms to all. The criterion for determining the validity of a provision in a school desegregation plan is whether the provision is reasonably related to accomplishing this objective.

* * * If the plan is ineffective, longer on promises than performance, the school officials charged with initi-

ating and administering a unitary system have not met the constitutional requirements of the Fourteenth Amendment; they should try other tools.

380 F.2d at 389.

The Duval County Board's plan was "longer on promises than on performance". The district court's majority-to-minority provision transfer is reasonably related to accomplishing the constitutional imperative of converting the dual system into a unitary, integrated system. Indeed, in the circumstances of this case, this policy may be necessary to correct the flaws in the Board's desegregation plan.

The district court found that geographic attendance zones had been drawn to "absolutely prevent any school desegregation whatever, or permit only the most 'token' integration". The court cited two instances where the boundaries of school zones had been "fixed along the streets separating white and Negro residential areas so as to exclude Negro students". The court also found that the Board favored a student's transferring out of his zone if he was in a minority race at the school in that zone.

The district court adopted two pragmatic solutions. First, it ordered the Board to establish a single system of non-racial attendance zones for all grades. "[Z]one boundaries or feeder patterns designed or used to perpetuate or promote segregation shall be discontinued, and such zone lines shall be redrawn, wherever feasible to maximize desegregation or eliminate desegregation". Second, the court strictly limited the right to transfer out of a zone to two special situations—i. e., a majority-to-minority transfer and a transfer to obtain a course of study or a special program not available at the neighborhood school. A majority-to-minority transfer policy similar to that decreed below is especially proper in this circuit, because of the residential patterns of many of our cities. In this situation, when it is not feasible to draw zone lines so as to completely eliminate segregation,

a majority-to-minority transfer policy tends to promote desegregation. It allows students, or their parents, to exercise a right of transfer from a school where their race is a majority to a school where their race is a minority. It requires a lagging school board to take affirmative steps to do away with the vestiges of the dual system of separate schools for Negroes and whites.

III.

In Board of Education of Oklahoma City Public Schools v. Dowell, et al., 10 Cir. 1967, 375 F.2d 158, cert. den. 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 993 (1967) the facts closely paralleled the facts in the instant case. The Court considered and upheld an order requiring the school board to establish a minority transfer policy along with other affirmative steps to disestablish segregation in the public schools:

The attendance line boundaries, as pointed out by the trial judge, had the effect in some instances of locking the Negro pupils into totally segregated schools. In other attendance districts which were not totally segregated the operation of the (majority) transfer plan naturally led to a higher percentage of segregation in those schools.

375 F.2d at 165.

The Court then held that "[u]nder the factual situation here we have no hesitancy in sustaining the trial court's authority to compel the board to take specific action in compliance with the decree of the Court so long as such compelled action can be said to be necessary for the elimination of the unconstitutional evils pointed out in the Court's decree". 375 F.2d at 166.

The minority transfer policy has been incorporated into the HEW Guidelines and is presently in effect in *all* counties having voluntary desegregation plans based on geographic attendance zones. See, Revised School Desegregation Plans Under Title VI of the Civil Rights Act of 1964, § 181.33. This Court has held that the Guidelines "establish minimum

standards clearly applicable to disestablishing state-sanctioned segregation". Jefferson II, 380 F.2d at 390. The pertinent guideline provision in effect at the time of the order below and this appeal provided:

> *Minority Transfer Policy.* A school system may (1) permit any student to transfer from a school where students of his race are a majority to any other school, within the system, where students of his race are a minority, or (2) assign students on such basis.

The Board relies on Goss v. Board of Education of the City of Knoxville, Tennessee, 1963, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632. In *Goss*, however, white students were permitted to transfer from predominantly Negro schools to predominantly white schools and Negroes from predominantly white to predominantly Negro schools. The majority transfer policy directly supported racial segregation in public schools. The Supreme Court gave it short shrift:

> It is readily apparent that the transfer system proposed lends itself to perpetuation of segregation. Indeed, the provisions can work only toward that end * * * As the Superintendent of Davidson County's schools agreed, the effect of the racial transfer plan was "to permit a child (or his parents) to choose segregation outside of his zone but not to choose integration outside of his zone." Here the right of transfer, which operates solely on the basis of a racial classification, is a one-way ticket leading to but one destination, i. e., the majority race of the transferee and continued segregation.

373 U.S. at 684–687, 83 S.Ct. at 1408, 10 L.Ed.2d at 635.

The district court order in this case plainly has the opposite effect: a student transferring from a school where his race is in the majority to one where it is in the minority is contributing to the desegregation of the school system.

■ There is no merit to the Board's argument that race may not be taken into account for purposes of transferring students. In some situations, there is no way of undoing the effects of past discrimination except by taking race into account.[8] As we pointed out in *Jefferson I*:

> The Constitution is both color blind and color conscious. To avoid conflict with the equal protection clause, a classification that denies a benefit, causes harm, or imposes a burden must not be based on race. In that sense, the Constitution is color blind. But the Constitution is color conscious to prevent discrimination being perpetuated and to undo the effects of past discrimination. The criterion is the relevancy of color to a legitimate governmental purpose.

Jefferson I, 372 F.2d at 876.

Here, in order to undo the effects of past discrimination, race may be taken into account in the manner directed by the plan approved by the district court, that is, by permitting each student whose race is the same as that of a majority of his schoolmates to transfer to a school where his race is not in a majority.

The Supreme Court has now slain all of the dragons the Board found so formidable. In Green v. School Board of New Kent County, 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716, the Court held that school boards have the affirmative duty of taking whatever steps should be necessary to effect the transition from a dual school system to a unitary system. In that case 15 percent of the Negro children attended predominantly white schools. In New Kent County, as in Duval County, no white children attended Negro schools.

We affirm the holding of the court below with respect to the transfer policy. We remand the case, however, to

---

8. For example, the "freezing principle" in voters' registration cases. United States v. Louisiana, E.D.La.1963, 225 F. Supp. 353, aff'd 1965, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709.

enable the district court to reconsider the entire plan in the light of Green v. School Board of New Kent County, 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716.

COLEMAN, Circuit Judge (specially concurring).

Since the District Court found that the attendance zones in this case had been drawn to "absolutely prevent any school desegregation whatever, or permit only the most 'token' integration", I agree that the minority transfer policy ordered by the District Court should be affirmed. This concurrence is based solely upon the particular facts of this case.

I likewise concur in the remand in order that the District Court may reconsider the entire plan in the light of Green v. School Board of New Kent County. In *Green* the Supreme Court holds that the transition to a unitary, nonracial system of public education is the ultimate end to be brought about and that school boards operating state-compelled dual systems as of 1955 are clearly charged with the affirmative duty to take whatever steps may be necessary to eliminate racial discrimination, root and branch.

The Court recognized that,

There is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance. It is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation. It is incumbent upon the District Court to weigh that claim in light of the facts at hand and in light of any alternative which may be shown as feasible and more promising in their effectiveness.

Significantly, the Supreme Court further said,

Moreover, whatever plan is adopted will require evaluation in practice, and the Court should retain jurisdiction until it is clear that state-imposed segregation has been completely removed.

The Court then concluded,

"[I]f there are reasonably available other ways, such for illustration as zoning, promising speedier and more effective conversion to a unitary, nonracial school system, 'freedom of choice' must be held unacceptable".

The problem inherent in a zoning plan is that people are free to move about as they see fit. Therefore, if they dislike the zone in which they are placed they will move to another. This often results in far more glaring segregation than that which existed prior to the inauguration of the plan. The end result of the zoning approach, if extensively exercised, is that large sections of the country may become a collection of zones or pockets, where only one race would be dominant. The National experience with the so-called ghettos in the large cities would indicate the undesirability of such an outcome.

In this very case the District Judge directed that one of the majority race in any particular zone should be given the unlimited right to transfer to another where his race is in the minority. This makes zoning meaningless and puts school attendance on an ad hoc basis. I assume the rule was thus invoked in this instance purely because there was really no rational zoning to begin with.

I wish to record my individual disapproval of that part of the District Court order which required the Duval County School Board to request the assistance of the United States Department of Health, Education, and Welfare. I adhere to the belief that, subject only to the requirements of the Constitution of the United States, the educational process is yet, and should be, a local matter, managed by duly chosen officials where the children live. I must assume that the Duval County School Board is capable of understanding and obeying

the Constitution of the United States without having officials of the Department of Health, Education, and Welfare serving, in effect, as ex-officio members of the local school board.

More and more, it becomes apparent that it is beyond the ability of this Court to supervise the operation of public schools in six states. It was widely asserted that our decision in *Jefferson* would take the Courts out of the school business. No such result was accomplished. The Courts are kept in this business when local school boards do not willingly and intelligently comply with the mandates of the United States Constitution, as interpreted by the Supreme Court. Such failures are causing the Courts to move from one inadequate approach to another, to the continued unsettled state of the educational process— a process which must be, and is, of the utmost importance to the welfare of this country. I think the Supreme Court in *Green* was trying to get the Courts out of this field by allowing such complete leeway for the legitimate solution of this problem in light of the facts in any particular case.

The quiet, effective, peaceable operation of the educational processes within the Fifth Circuit will never be accomplished by court decisions. It is high time duly chosen local officials exercise that due care in the obedience of the Constitution which will take education out of the courthouse and return it to the school house.

Just as surely as this country could not remain half slave and half free we cannot long maintain an effective school system half managed by the States and half controlled by Federal officials, with the Courts trying to supervise them both.

With these comments, I concur in the opinion written for the Court by Judge WISDOM.

RUBIN, District Judge (specially concurring).

*Green*[1] emphasizes that school officials have a continuing duty to take whatever action may be necessary to provide "prompt and effective disestablishment of a dual system." If one method is ineffective, they are to try another. Hence, no single plan is or can be judicially approved as a catholicon.

*Brown I*[2] and all of its successors, as well as *Green*,[3] *Monroe*,[4] and *Raney*,[5] contemplate that school plans will be prepared by local officials and school boards, not by courts. But if local officials fail to assume their responsibilities under the Constitution, district courts must continue to attempt to formulate the plans that should be prepared by school officials based on their expert knowledge, training and skill. In this case, since the school board had not done its duty, the trial judge entered the decree approved in *Jefferson II*,[6] with the modifications that he considered necessary to do the job in Duval County. Our approval of this plan as modified and our remand for reconsideration, should create no inference of disapproval of other methods so long as the plan that is adopted "promises realistically to work *now*."[7]

1. Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

2. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

3. Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689 (1968).

4. Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968).

5. Raney v. Board of Education, 391 U.S. 433, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968).

6. United States v. Jefferson County Board of Education, 5 Cir., 1967, 380 F.2d 385.

7. Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).