Joyce Marie MOORE, Jerry Moore, and Thelma Louise Moore, minors, by their father and next friend, M. C. Moore; Bennie Smith, Charles Edward Smith, Shirley Ann Smith, and Earline Smith, minors, by their father and next friend, Henry Smith, Plaintiffs,

v.

TANGIPAHOA PARISH SCHOOL BOARD, a corporation, C. B. Sledge, President, and Dewitt Sauls, Superintendent, Defendants.

Joseph Durham, Roger Durham, minors, by their father and next friend, Max Durham, Jr.; William Lee Travis, III, Clare Lee Travis, minors, by their father and next friend, Dr. William L. Travis; Robert Leslie Jackson, III, minor, by his father and next friend, Robert Jackson, Defendant-Intervenors.

Civ. A. No. 15556.

United States District Court
E. D. Louisiana,
New Orleans Division.
July 2, 1969.

Franklin E. White, Norman J. Chachkin, New York City, A. P. Tureaud, New Orleans, La., for plaintiffs.

John F. Ward, Jr., Baton Rouge, La., Leonard E. Yokum, Dist. Atty., Hammond, La., for defendants.

John D. Kopfler, Jr., Hammond, La., for defendant-intervenors.

RUBIN, District Judge.

The schools of Tangipahoa Parish are still largely segregated. From Brown II, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, decided in 1955, to United States v. Montgomery County Board of Education, 1969, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263, decided on June 2, 1969, the United States Supreme Court has said in unmistakable terms that the primary responsibility for abolishing the system of segregated schools rests with local school authorities. Once again, we have had a series of hearings because in Tangipahoa Parish the task has as yet been left undone.

On October 15, 1968, the court ordered the Tangipahoa Parish School Board to submit a plan for the unitary operation of its school system for the 1969–1970 school year. Moore v. Tangipahoa Parish School Board, E.D.La., 1968, 298 F.Supp. 283, affirmed, Hall v. St. Helena Parish School Board, 5 Cir., May 28, 1969, 417 F.2d 801. The Board reported on November 11, 1968 that it was unable to find a better plan than the "freedom of choice" plan then in use—a plan under which more than 96.4% of the Negro students attended all black schools, and, under which, in its second year of operation, the percentage of Negro students choosing to attend classes in integrated schools declined from 4.1% to 3.6%.[1]

On November 26, 1968, the court ordered the Board to request the Educational Resource Center on School Desegregation to prepare a desegregation plan. Moore v. Tangipahoa Parish School Board, E.D. La.1968, 298 F.Supp. 285. The Board opposed the adoption of the Center's plan, and it was joined by defendant-intervenors representing white students and their parents. See Moore v. Tangipahoa Parish School Board, E.D.La., April 3, 1969, 298 F.Supp. 288. Instead, the Board presented the court with an alternative plan that clearly did not comply with the court's previous orders: it proposed that 20% of the black students would be enrolled in predominantly white schools; in all other respects, "freedom of choice" would continue, with the likely result that a large number of Negro students would continue to attend schools that had no white students. The intervenors presented a more elaborate plan to continue freedom of choice and phase it out over a three year period, with extensive proposals for school improvement in the interim. No doubt the intervenors were interested in good education, but they failed to take proper account of the legal rights of black students and of overriding constitutional requirements.

At the conclusion of the hearing on May 28, 1969, the court reminded school officials that the Tangipahoa Parish School System is their responsibility. But because the Constitution forbids the operation of black schools or white schools, and requires a plan of unitary school operation that "promises realistically to work, and promises realistically to work now," Green v. County School Board, 1968, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716, this court would write an order compelling the Board to operate its schools in a manner that would meet the requirements of the Constitution.

Thereafter, the court's remarks were read to the School Board, and they voted to submit a new plan for the operation of the Parish schools for the coming year. The court had indicated that it did not intend to hold further hearings, but the new plan contained a number of proposals that reflected an effort to devise a unitary school system. Therefore, a further hearing was held on June 17, 1969.

This court does not purport to know how to run any school, let alone an entire

---

1. Of the 294 black students who attended previously all white schools in 1968–69, 99 (34%) were enrolled in the Southeastern School, a laboratory school exempted from the court's prior orders requiring freedom of choice, inasmuch as it has been operated on a non-discriminatory basis by Southeastern Louisiana College in conjunction with its teacher training programs.

educational system. Local officials are elected to perform that duty with the assistance of expert school administrators. When they indicate a real desire to run their schools on a constitutionally valid basis, they should be afforded every opportunity to do so. Neither the fact that they have undertaken to perform their duty late in the day, nor the usual exigencies of judicial administration, nor even the justifiable concern of opposing parties that a plan may have been submitted at the last moment only to avert the adoption of a pattern formulated by someone else should preclude elected school officials from administering their schools when they do so lawfully.

■■ Some of the objections to the School Board's latest plan are based on alleged defects from an educational and administrative standpoint. But the court will not alter particulars of the plan merely because they appear to be administratively awkward. "[N]o single plan is or can be judicially approved as a catholicon," Board of Public Instruction of Duval County v. Braxton, 1968, 5 Cir., 402 F.2d 900, 908 (concurring opinion). The Center's plan appears to the court to be educationally sound; it was prepared by well qualified consultants. But this plan cannot be viewed as the one answer to the operation of the Tangipahoa Parish schools. Local plans may prove defective in educational principle; they may require alteration after a trial period. But local school boards must be free to experiment within constitutional grounds. For no savant can be arrogant enough to pretend that he knows *the* way—or indeed a way—to accomplish school integration with maximum educational advantage and without friction. In this delicate area, we are all still feeling our way, educators and philosophers, parents and teachers, school board and judges.[2]

■■ So long, therefore, as a school board has a plan that promises realistically to effectuate a unitary school system in September, 1969, it should be approved. It is the court's duty, however, to be certain that the plan affords every child equal protection of the law. If any part of it does not fully satisfy constitutional requirements, that part must be rejected.

Five particular features of the Board's plan require comment:

I. The Board proposes that six major high schools in the Parish be operated under freedom of choice for the 1969–70 school year. But there is no evidence to indicate that freedom of choice will operate more effectively in 1969 than it has in the past. Almost certainly, therefore, the plan will result in six racially identifiable high schools. Even if some Negro students voluntarily choose, or can be encouraged to choose, or can be assigned to high schools hitherto predominantly white, there is no likelihood that any number of white students will elect or can be successfully encouraged to attend the three high schools hitherto attended exclusively by Negroes.

Four of the high schools would be housed in buildings containing desegregated elementary grades. For this reason, it is urged that these four schools would be desegregated schools.

■ But the United States Supreme Court has told us that the entire school system must be unitized "root and branch," United States v. Montgomery County Board of Education, 1969, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263. A high school is a basic educational unit. When racially identifiable under freedom of choice, it is not a unitized desegregated school, even if children of the opposite race attend elementary school classes in the same building.

2. For further discussion and reflection, see the Coleman Report, "Equality of Educational Opportunity," published by the United States Office of Education, the Report of the United States Civil Rights Commission, "Racial Isolation in the Public Schools," and the Report of the Louisiana Public Affairs Research Council, "Improving Quality During School Desegregation." Unfortunately, they provide no ready answers.

The Board vigorously contends that, when accompanied by elementary school desegregation, freedom of choice in the high school grades in these six schools will best "effectuate a transition to a racially nondiscriminatory school system." Hall v. St. Helena Parish School Board, 5 Cir., May 28, 1969, 417 F.2d 801.

The School Board urges that, in the long run, the people of its area will more readily accept and support a unitary system after such a transition period. It has pointed out that transferring high school students en masse will cause various difficult adjustment problems—loss of possible academic and athletic scholarships, deprivation of class offices for those students who have already been chosen, break up of clubs and athletic teams. The plaintiffs, on the other hand, urge that the system must be unitized "root and branch" now so that school officials can get on with the job of providing the best possible education for all children in the Parish in schools that are neither white nor black "but just schools." Green v. County School Board, supra 391 U.S. at 442, 88 S.Ct. 1689, 20 L.Ed.2d 716.

The court may no longer weigh these contentions solely on the basis of educational merit and efficient administration. "The time for * * * 'deliberate speed' has run out." Griffin v. County School Board, 1964, 377 U.S. 218, 234, 84 S.Ct. 1226, 1235, 12 L.Ed.2d 256. Green,[3]

Jefferson County,[4] Davis,[5] Hall,[6] Anthony,[7] Indianola,[8] Henry,[9] Greenwood,[10] and the October 15, 1968, Order of this court[11] all require a plan for a unitary school system that "promises realistically to work now." More specifically, Adams v. Mathews, 5 Cir., 1968, 403 F.2d 181, 188, states: [T]he court should require the board * * * to formulate and submit * * * a plan to complete the full conversion of the school district to a unitary, non-racial system for the 1969–70 school year." (Emphasis supplied).

In Graves v. Walton County Board of Education, 5 Cir., Sept. 24, 1968, 403 F.2d 181, 189, a similar case, the court reviewed a district court order that fully unitized the Walton County School System under a plan based on geographic attendance zones with the exception of grades 8–12 at one high school, the George Washington Carver School; this was to be attended solely by Negro students for a single transitional year. Under the district court's order, children of both races in grades K–7[12] were to attend classes in the Carver building with only grades 8–12 operating on a racially identifiable basis. The Fifth Circuit commended the district court for acting with dispatch in unitizing the system with the exception of the Carver High School. But with respect to this school, it said: "This is a highly unsatisfactory situation which should be cured as promptly as possible and no later than

3. Green v. County School Board, 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716.

4. United States v. Jefferson County Board of Education, 5 Cir., June 26, 1969, 417 F.2d 834.

5. Davis v. Board of School Commissioners of Mobile County, 5 Cir., June 3, 1969, 414 F.2d 69.

6. Hall v. St. Helena Parish School Board, 5 Cir., May 28, 1969, 417 F.2d 801.

7. Anthony v. Marshall County Board of Education, 5 Cir., April 15, 1969, 409 F.2d 1287.

8. United States v. Indianola Municipal Separate School District, 5 Cir., April 11, 1969, 410 F.2d 626.

9. Henry v. Clarksdale Municipal Separate School District, 5 Cir., March 6, 1969, 409 F.2d 682.

10. United States v. Greenwood Municipal Separate School District, 5 Cir., February 4, 1969, 406 F.2d 1086.

11. Moore v. Tangipahoa Parish School Board, E.D.La., 1968, 298 F.Supp. 283; Affirmed, Hall v. St. Helena Parish School Board, 5 Cir., May 28, 1969, 417 F.2d 801.

12. Kindergarten and grades 1–7.

*the 1969–70 term."* (Emphasis supplied). *See also,* Davis v. Board of School Commissioners of Mobile County, 5 Cir., June 3, 1969, 414 F.2d 69. Hence, in Tangipahoa Parish, the high schools must be fully unitized this September.

II. Under the proposed School Board plan, grades K–4 in Ward Four will remain racially identifiable. White children in these grades will continue to attend the Chesbrough School and Negro children will continue to attend the Mt. Canaan School. This feature of the School Board's plan does not meet constitutional requirements and must be rejected. Along with all other schools in Tangipahoa Parish, the schools in Ward Four must be fully unitized.

III. The Board's plan does not specifically provide for classroom assignments. The Superintendent of Schools testified that the assignment of each individual student would be left to the principal of the school he attends. Such a system of assignment is proper, for the school principal, assisted by his teachers, is best qualified to make such decisions. But the Superintendent added that, if, in a building housing two first grades, classroom assignments resulted in a black first grade and a white first grade, the school would in his view be a desegregated school, since it taught children of both races. This view is erroneous. A school composed of white classes and black classes is not desegregated. Students must be assigned to classes, even as they must be assigned to schools, in a racially non-discriminatory fashion, and no classes may be racially identifiable. This does not of course prevent the classification of students by any criteria that are not racially discriminatory.

IV. The School Board proposes that, on a limited basis in Ward Six and in the Ponchatoula section of Ward Seven, the transition to a unitary school system be accomplished by assigning boys and girls to separate schools. Plaintiffs contend that this proposal is racially motivated, and point out that separate education on the basis of sex was not considered until the schools were ordered to desegregate.

The court recognizes that the trend in modern education is in the other direction. But educational decisions are for the School Board alone. Many school districts in this country have long operated separate schools for boys and girls. This educational philosophy is also practiced in many colleges and universities although their number is decreasing every year.

Separate education on the basis of sex has not been proposed on a parish wide basis. Only a few schools in one ward and a few grades in one section of another ward wish to employ it. The School Board is convinced that in this transitional period separate education based on sex would provide the atmosphere most conducive for learning in these schools. The School Board has advanced this plan as an experiment. These next school years are especially appropriate for educational experimentation. Old patterns are breaking up and desegregation may be the stimulus that educators have needed in order to institute educational reforms. Hence, at this time, separate education on a limited basis in Wards Six and Seven during a transitional period is not a denial of equal protection of the law and it will be approved.

V. There are presently five elementary school buildings in Hammond. The Board proposed to utilize them in the following manner:

a. Woodland Park Elementary School —all Kindergarten and First grade classes in the community.

b. Mooney Avenue Elementary School —all Second grade classes in the community.

c. Pine Ridge Elementary School— all Third grade classes in the community.

d. Crystal Street Elementary School —all Fourth grade classes in the community.

e. Hammond Eastside Elementary School—all Fifth grade classes in the community.

The Center has prepared alternative plans based primarily on geographic attendance zones; one was prepared at the court's request, just a few days before the most recent hearing.

The court recognizes that the plan proposed by the Board is unorthodox. Bus routes will be duplicative and complex. Parents with more than one child of grade school age will have to send each child to a different school. No longer will younger students have older students in the same building to serve as models.

Nonetheless, the Board and the Intervenors have strongly supported this facet of their plan. Among the reasons urged for its adoption during this transitional year is that, thereby, the ratio of white to Negro students in each school will approximate the ratio of white to Negro students in the community, while under a plan based on geographic zones, some schools might be predominantly white and some might be predominantly Negro. Furthermore, in order to achieve a unitary system, it is essential that large numbers of students be assigned to schools other than those they were previously attending. Whatever plan is employed, it is likely that many parents of both races will be dissatisfied with their children's new school assignments. By utilizing a different school for each grade, and assigning all students in a particular grade to the same school, the Board's plan assures that each student will attend each school facility for the same period of time, thus perhaps minimizing parental dissatisfaction with their children's assignments.

The disadvantages in this method of assignment may outweigh its advantages. However, the School Board recognizes the problems inherent in the plan, and considers it an experiment, believing that it may be the best method of effectuating the transition to a racially nondiscriminatory school system in Hammond. Whatever its educational value, it is clear that, if classroom assignments in each school are made on a racially non-identifiable basis, the plan will convert the Hammond School System into a system with "just schools." It will therefore be approved.

■ The Intervenors have urged that any plan ordered by the court would violate the provisions of Section 407(a) of the Civil Rights Act of 1964 relative to bussing students. That section reads in part:

"* * * provided that nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance * * *." 42 U.S.C. 2000c–6(a).

This court's order, however, is not being issued under the 1964 Civil Rights Act but under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution in a suit brought by a private party under 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983.[13]

Moreover, this order does not require the transportation of students from one school or school district to another in order to achieve racial balance. Tangipahoa is a large parish and busses have long been used to transport children to school. Indeed, in Tangipahoa Parish in the 1968–69 school year, and, apparently, in prior years, both Negro students and white students have been bussed to separate schools in order to effectuate segregation. In many instances, Negro children have literally been transported past the front door of a white school so that they might attend a Negro school a greater distance from their homes. Except in those instances (as in Hammond) where the School Board itself proposes a unitary plan that requires extensive

13. 42 U.S.C. 2000e–6(a) refers specifically to suits filed by the Attorney General upon receipt of a written complaint.

bussing, the plan contained in the court's order will require fewer students to be bussed, and those students that must be bussed to be transported shorter distances, than was the case in the last school year. Each student has been assigned to the unitary school in his ward that is nearest his home. The School Board has not been required to transport any particular student merely ' to balance the races in any school or to eliminate patterns of *de facto* segregation. The plan requires only that busses, as well as schools, be furnished to black and white alike on a nondiscriminatory basis. .*See generally*, United States v. School District 151 of Cook County, Illinois, 7 Cir. 1968, 404 F.2d 1125, 1130.

■■■■ The brief *amicus curiae* submitted on behalf of the "Pulliam group" [14] urges that school children of each race have a constitutional right to choose the school they will attend, "subject only to administrative considerations which do not take into account or are not related to the considerations of race." This is both historically incorrect and constitutionally inaccurate. [15] In most school districts in this country, school assignments have always been made on a geographic basis; a child has

attended the school in his school district nearest his home. Likewise, in the states embraced by the Fifth Circuit, as well as in some other geographic areas, students also have been assigned on a geographic basis, except that racial segregation was enforced by assigning Negro students to Negro schools nearest their homes, and similarly, white students to white schools nearest their homes. Neither white parents nor black parents had freedom to choose their children's schools.

The freedom of choice method of school assignment was devised only in the last few years in an effort to effect an orderly and expeditious transition to a unitary system. [16] This method has never been an end in itself: it was tried solely as a means to an end. [17] But it has not worked—either in Tangipahoa Parish or elsewhere. So we turn here to another method, to achieve the result the Constitution requires—a unitary school system.

The plan approved this date clearly meets the definition of "desegregation" as set forth in Secton 401(b) of the 1964 Civil Rights Act:

" 'Desegregation' means the assignment of students to public schools and

---

14. With leave of the court, a brief *amicus curiae* was filed by Charles B. W. Palmer, Esq., for Patsy Ruth Pulliam, Claude Wesley Pulliam, Jr., and Joseph Wayne Pulliam, minors, by their natural tutor, Claude Pulliam; Edward G. Mason, III and Nicholas Allen Mason, minors, by their natural tutor, Edward G. Mason, Jr.; Linda McAulay, Becky McAulay, Terry McAulay, and Larry McAulay by their natural tutor, E. D. McAulay. *See* Moore v. Tangipahoa Parish School Board, E.D.La., April 3, 1969, 298 F. Supp. 288, 295.

15. "[T]here is no constitutional 'right' for any student to attend the public school of his own choosing." Moses v. Washington Parish School Board, E.D.La., 1967, 276 F.Supp. 834, 851; *Accord*, Green v. County School Board, 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716; Hall v. St. Helena Parish School Board, 5 Cir., May 28, 1969, 417 F.2d 801; United States v. Greenwood Municipal Separate School District, 5 Cir.,

1969, 406 F.2d 1086; Board of Public Instruction of Duval County v. Braxton, 5 Cir., 1968, 402 F.2d 900, 904; United States v. Jefferson County Board of Education, 5 Cir., en banc, 1967, 380 F.2d 385, 390. As Judge Godbold pointed out in *Hall, supra*:

"All now know, judges, lawyers and school boards, that freedom of choice, *Jefferson* variety or otherwise, is not a constitutional end in itself but only a means to the constitutionally required end of the termination of the dual school system."

16. For a good discussion of the origins and development of freedom of choice plans and their inherent administrative difficulties, see Judge Heebe's opinion in Moses v. Washington Parish School Board, E.D. La., 1967, 276 F.Supp. 834 at 847–852.

17. United States v. Jefferson County Board of Education, 5 Cir., en banc, 1967, 380 F.2d 385, 390.

within such schools without regard to their race, color, religion, or national origin, but 'desegregation' shall not mean the assignment of students to public schools in order to overcome racial imbalance." 42 U.S.C. § 2000c (b).

The plan merely ensures that students will in fact be assigned to schools without regard to their race. No individual student has been assigned to any school in order to overcome patterns of *de facto* segregation and achieve racial balance.

The Tangipahoa Parish School System shall be operated according to the basic plan proposed by the Tangipahoa Parish School System, subject to those modifications that are constitutionally required. Specific provisions of the plan are set forth in the attached order.

## ORDER

It is ordered that the Tangipahoa Parish School System hereafter be operated as follows:

### I. GENERAL PROVISIONS

A. All classroom assignments shall be made on a racially non-discriminatory basis and in such a manner that no class is racially identifiable.

B. All educational programs, activities, and services, curricular or extra-curricular, sponsored, conducted, operated or supported by the Tangipahoa Parish School System shall be run on a racially non-discriminatory basis.

C. All school facilities, recreational areas, and meeting rooms shall be utilized in a non-discriminatory manner.

D. All school sponsored organizations shall be run on a racially non-discriminatory basis.

E. The principal of each of the schools that will be closed shall be assigned either as a principal to some other school, or as an assistant principal in a school that a member of the opposite race is serving as principal, unless it is determined in a particular instance that this is not educationally feasible for a valid reason not related to race. Principals of all other schools shall remain in charge of those schools unless reassignment is required for some reason other than race.

F. Teacher assignments in each school shall be made so that the ratio of white to Negro teachers in each school approximates the ratio of white to Negro teachers in the Tangipahoa Parish School System.

G. Principals, teachers, administrative personnel, members of the professional staff, athletic coaches, and other persons in positions of responsibility or authority shall not be assigned, promoted, demoted, or dismissed on a racially discriminatory basis, nor in any manner that makes a school racially identifiable by the race of its staff. Any personnel displaced as a result of a school closing shall be assigned to a similar position in some other school on a racially non-discriminatory basis. This shall not prevent the School Board from failing to continue the employment of any teacher who is not entitled to tenure under state law, so long as its decision is reached without racial discrimination of any kind.

H. No employee or future applicant for employment in the Tangipahoa Parish School System in any capacity shall be refused employment, hired, fired, promoted, demoted, or assigned on a racially discriminatory basis, nor shall any contract for bus or other services be let or terminated on a racially discriminatory basis.

I. In hiring teachers in the future, the School Board shall make every effort to maintain the same approximate ratio of white to Negro teachers, administrators, and athletic coaches as that existing in the 1969–70 school year. This shall not prevent the School Board from setting objective criteria for employment or from hiring the personnel best qualified to do a specific job, so long as its decision is reached without racial discrimination.

J. All bus routes shall be planned and the assignment of students to busses shall be made on a racially non-discrim-

inatory basis according to natural transportation patterns. All bus service shall be rendered on a like basis to all students without regard to their race.

K. In accordance with the Jefferson Decree issued by this court on July 12, 1967:

"The defendants shall provide remedial education programs which permit students * * * who have previously attended segregated schools to overcome past inadequacies in their education."

The Superintendent of Schools shall request the assistance of the Educational Resource Center on School Desegregation in developing remedial programs and in obtaining such federal funds as may be available. The Superintendent of Schools shall file a report with the court, opposing counsel and the Center by August 15, 1969 concerning the programs to be offered in the 1969–70 school year.

L. In-service teacher training programs shall be offered so that teachers may remedy any inadequacies in their preparation, and so that they may be better prepared to deal with the problems arising from school desegregation. Such programs shall be implemented as soon as possible and no later than September 1969. The Superintendent of Schools shall request the assistance of the Educational Resource Center on School Desegregation in developing training programs and in obtaining such federal funds as may be available for them. The Superintendent of Schools shall file a report with the court, opposing counsel, and the Center by August 15, 1969 concerning the programs that were offered this summer and those that will be offered during the 1969–70 school year.

M. No student shall be prevented from participating in athletic contests, or any other activity, conducted or sponsored by the Tangipahoa Parish School System as a result of changes in school or class assignment made to effect this Order.

N. The selection of sites for schools to be constructed in the future, the selection of schools to be enlarged or altered, and all other future construction programs shall effectuate the development and continuation of a unitary school system serving the educational needs of the community without regard to race.

O. The Superintendent of Schools shall report to the court, opposing counsel, and the Educational Resource Center on School Desegregation by August 15, 1969, and each year thereafter, the number of students by race assigned to each classroom in each grade for all schools in Tangipahoa Parish. The report shall indicate the number of teachers, coaches, and administrators of each race assigned to each school, and it shall include the name of the principal of each school in the system, and his race, and the name and race of the assistant principal, if any.

P. With respect to Wards Six and Seven where separate education for boys and girls has been approved on a limited basis for 1969–70, the School Board shall report its plan for the 1970–71 school year to the court, opposing counsel, and the Educational Resource Center on School Desegregation no later than March 1, 1970.

Q. Jurisdiction is retained by the court. Leave is granted all parties to petition from time to time for any improvements or modifications to the plan that might aid in the operation of a racially non-discriminatory, unitary school system.

R. A copy of this Order shall be distributed to every employee of the Tangipahoa Parish School Board. Copies shall also be made available to each student and to the parents of each student at each school, and at the School Board office.

S. This Order supersedes all orders previously issued by the court.

## II. SPECIFIC PROVISIONS

The schools in each ward in Tangipahoa Parish shall hereafter be operated as follows:

A. With the exception of grades 9–12 in Ward Eight, each student shall attend school in the ward in which he resides.

B. *Ward One*

1. The Casey Lane School shall be closed.

2. The Kentwood School shall consist of a Kindergarten for all students residing near the school and grades 1–3 and 9–12 for all students in the ward.

3. The Dillon School shall consist of a Kindergarten for all students residing near the school and grades 4–8 for all students in the ward.

C. *Ward Two*

1. The Spring Creek School shall consist of grades K–12 for all students residing in Ward Two.

D. *Ward Three*

1. The Roseland Elementary School shall consist of grades K–3 for all students residing in the Roseland area.

2. The Big Zion School shall consist of grades 4–6 for all students residing in the Roseland area.

3. The Amite Elementary School shall consist of grades K–3 for all students residing in the Amite area.

4. The Westside School shall consist of grades 4–9. (Grades 4–6 for all students residing in the Amite area and grades 7–9 for all students in the ward).

5. The Amite High School shall consist of grades 10–12 for all students residing in the ward.

E. *Ward Four*

1. The Mt. Canaan School shall consist of grades K–4 for all students residing in the ward.

2. The Chesbrough School shall consist of grades 5–12 for all students residing in the ward.

F. *Ward Five*

1. The Hillcrest and Union Training Schools shall be closed.

2. The Sweetwater School shall consist of grades K–5 for all students in the ward in grades K–5 who would formerly have attended the Sweetwater School and all students in the ward in grades K–5 who would formerly have been bussed to attend school in another ward.

3. The Loranger School shall consist of grades K–12 for all students residing in the ward with the exception of those in grades K–5 who have been assigned to the Sweetwater School.

4. All students who formerly attended the Union Training School and the Hillcrest School shall be assigned to the Loranger School. All students who have previously been bussed to other wards shall attend school in Ward Five.

G. *Ward Six*

1. The Midway School shall be closed.

2. The Tickfaw—Natalbany areas shall have two coeducational schools for all elementary school students in the Tickfaw and Natalbany areas:

Nesom Elementary School—grades K–8

Natalbany Elementary School—grades K–8

Pupil assignments to these two schools shall be made on the basis of racially nondiscriminatory geographic zones and established transportation routes so that the ratio of white to Negro students at each school is approximately in accordance with the projections submitted by the School Board:

Nesom Elementary School—266 white, 117 Negro

Natalbany Elementary School — 225 white, 150 Negro

3. The Independence Elementary School shall consist of grades K–3 for all students in the Independence area and grades 4–6 for all girls in the Independence area.

4. The Independence High School shall consist of grades 7–12 for all girls in Ward Six with the exception of those residing in the Tickfaw-Natalbany areas who have been assigned to the Nesom Elementary or Natalbany Elementary Schools.

5. The Burgher School shall consist of grades 4–12 for all boys in Ward Six with the exception of those residing in the Tickfaw-Natalbany areas who have been assigned to the Nesom Elementary or Natalbany Elementary Schools.

H. *Ward Seven—Hammond*

1. The Woodland Park Elementary School shall consist of grades K–1 for all students in the Hammond area.

2. The Mooney Avenue Elementary School shall consist of grade 2 for all students in the Hammond area.

3. The Pine Ridge Elementary School shall consist of grade 3 for all students in the Hammond area.

4. The Crystal Street Elementary School shall consist of grade 4 for all students in the Hammond area.

5. The Hammond Eastside Elementary School shall consist of grade 5 for all students in the Hammond area.

6. The "Old" Hammond High School shall consist of grades 6–7 for all students in the Hammond area.

7. The Greenville Park School shall consist of grades 8–9 for all students in the Hammond area.

8. The "New" Hammond High School (Wardline School) shall consist of grades 10–12 for all students in the Hammond area.

9. The Southeastern "Lab" School shall continue to operate as a laboratory school for grades K–8 on a fully desegregated basis.

I. *Ward Seven—Ponchatoula*

1. The Tucker School shall consist of a neighborhood kindergarten for boys and girls of both races, plus grades 1–4 for all girls in the Ponchatoula area.

2. The Reeves School shall consist of a neighborhood kindergarten for boys and girls of both races, plus grades 1–4 for all boys in the Ponchatoula area.

3. The Martha Vineyard School shall consist of a neighborhood kindergarten for boys and girls of both races, plus grades 5–6 for all students in the Ponchatoula area.

4. The Perrin Junior High School shall consist of grades 7–8 for all students in the Ponchatoula area.

5. The Ponchatoula High School shall consist of grades 9–12 for all students in the Ponchatoula area.

J. *Ward Eight*

1. The Champ Cooper School shall consist of grades K–8 for all students residing in Ward Eight.

2. Students in grades 9–12 shall be bussed to either Hammond or Ponchatoula on the basis of non-discriminatory transportation routes.

## III. APPENDIX

The School Board is urged to appoint one or more bi-racial committees in each ward composed of parents, teachers, and recognized community leaders of both races. These committees should consider and make recommendations about such matters as changes in school names, revision of the grading system, improvement of school facilities including libraries, means of easing tension in the community, ways to make desegregation work more effectively, programs that parents may participate in, and possible solutions to problems that may arise due to school desegregation. The committees should have no authority to make decisions of any kind, and their formation shall not in any way deprive the School Board of any power given it by State law, or any duty imposed on it by State law, or by the United States Constitution.