UNITED STATES of America,
Appellant,

v.

GREENWOOD MUNICIPAL SEPARATE
SCHOOL DISTRICT et al., Appellees.

GREENWOOD MUNICIPAL SEPARATE
SCHOOL DISTRICT et al., Appellants,

v.

UNITED STATES of America,
Appellee.

No. 25714.

United States Court of Appeals
Fifth Circuit.

Feb. 4, 1969.

Rehearing Denied March 5, 1969.

H. M. Ray, U. S. Atty., Oxford, Miss., Stephen J. Pollack, Asst. Atty. Gen., Nathan Lewin, Atty., Dept. of Justice, Washington, D. C., Dorothy Battle Rankin, Carol R. Aronoff, Attys., Department of Justice, Washington, D. C., for appellants.

Hardy Lott, of Lott, Sanders & Gwin, Greenwood, Miss., William A. Allain, Asst. Atty. Gen., Jackson, Miss., for appellees.

Before JOHN R. BROWN, Chief Judge, THORNBERRY, Circuit Judge, and TAYLOR, District Judge.

THORNBERRY, Circuit Judge:

At issue in this case is the school desegregation plan approved by the district court for the Greenwood Municipal Separate School District in Greenwood, Mississippi. Before evaluating the merits of the plan, we must pass on procedural questions raised by the distinguished counsel for the school district. First, he argues that the action should have been dismissed for the Government's refusal to produce any evidence to establish its right to file suit under Section 407 of the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6. Speaking exclusively to appellate jurisdiction, he argues that the Government cannot complain in this Court of an action taken by the district court at its own request. Specifically, the contention is that the Government should not be allowed to attack the adequacy of *Jefferson*-type freedom of choice and ask this Court to prescribe a new attendance plan when the *Jefferson* decree was approved by the district court on the Government's motion.[1]

Section 407[2] provides generally that when the Attorney General is

---

1. In September, 1966, the district court approved an attendance plan which combined freedom of choice and geographic zoning. In September, 1967, in response to the Government's motion, the freedom of choice provisions were amended in accordance with the *Jefferson* decree. This appeal is from the September, 1967 decision.

2. 42 U.S.C. § 2000c–6:

(a) Whenever the Attorney General receives a complaint in writing—

(1) signed by a parent or group of parents to the effect that his or their minor children, as members of a class of persons similarly situated, are being deprived by a school board of the equal protection of the laws, or

(2) signed by an individual, or his parent, to the effect that he has been denied admission to or not permitted to continue in attendance at a public college by reason of race, color, religion, or national origin,

and the Attorney General believes the complaint is meritorious and certifies that the signer or signers of such complaint are unable, in his judgment, to initiate and maintain appropriate legal proceedings for relief and that the institution of an action will materially further the orderly achievement of desegregation in public education, the Attorney General is authorized, after giving notice of such complaint to the appropriate school board or college authority and after certifying that he is satisfied that such board or authority has had a reasonable time to adjust the conditions alleged in such complaint, to institute for or in the name of the United States a civil action in any appropriate district court of the United States against such parties and for such relief as may be appropriate, and such court shall have and shall exercise jurisdiction of proceedings instituted pursuant to this section, provided that nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards. The Attorney General may implead as defendants such additional parties as are or become necessary to the grant of effective relief hereunder.

Persons unable to initiate and maintain legal proceedings

(b) The Attorney General may deem a person or persons unable to initiate and maintain appropriate legal proceedings within the meaning of subsection (a) of this section when such person or persons are unable, either directly or through other interested persons or organizations, to bear the expense of the litigation or to obtain effective legal representation; or whenever he is satisfied that the institution of such litigation would jeopardize the personal safety, employment, or economic standing of such person or persons, their families, or their property.

"Parent" and "complaint" defined

(c) The term "parent" as used in this section includes any person standing in loco parentis. A "complaint" as used in this section is a writing or document within the meaning of section 1001, Title 18. Pub.L. 88–352, Title IV, § 407, July 2, 1964, 78 Stat. 248.

satisfied he has received meritorious complaints from the parents of children in a school system to the effect that the children are being deprived by the school board of the equal protection of the laws and when he is further satisfied that the parents are unable to initiate legal proceedings themselves, he may, after notifying the school board of the complaints and issuing a certificate verifying the existence of the complaints, file suit in federal district court. In August, 1966, Attorney General Katzenbach issued the certificate required by the statute [3] and filed suit in the court below. The school board filed an answer in which it denied that any children in the system were being deprived of equal protection of the laws. In addition, it filed interrogatories and a motion to produce under Rules 33 and 34 in order to elicit the names of the complainants and the precise nature of their complaints. In essence, these motions were designed to test the validity of the Attorney General's certificate. But the trial judge said he did not believe Congress intended the certificate to be subject to judicial review and therefore sustained the Government's objections to the motions.

The legislative history of section 407 supports the court's ruling:

> As a prerequisite to suit, the Attorney General would be required to certify that the signers of the complaint were "unable to initiate and maintain appropriate legal proceedings" for relief, and that the institution of an action would materially further the public policy favoring the orderly achievement of desegregation in public education. *It is not intended that determinations on which the certification was based should be reviewable.* [H.R. Report No. 914, 88th Cong., 1st Sess., pp. 23–24, 1964 U.S. Code Congressional and Administrative News, at 2355, 2399 (emphasis added)].

A supplemental Certificate of the Attorney General was filed with the district court on August 22, 1966:

> I, Nicholas deB. Katzenbach, Attorney General of the United States, hereby certify that the signers of the complaints described in my Certificate filed heretofore in this action, are unable, in my judgment, to institute and maintain appropriate legal proceedings for relief because they are unable, either directly or through other interested persons or organizations, to bear the expense of the litigation or to obtain effective legal representation; and I am satisfied that the institution of such litigation would jeopardize the personal safety and economic standing of such persons, their families, and their property.
>
> This Supplemental Certificate is made pursuant to the provisions of 42 U.S.C. 2000c–6(a), in support of the complaint filed heretofore in this action.
>
> Signed this 18th day of August, 1966.
>
> /s/ Nicholas deB. Katzenbach
> NICHOLAS deB. KATZENBACH
> Attorney General

3. I, NICHOLAS deB. KATZENBACH, Attorney General of the United States, hereby certify that I have received complaints in writing signed by parents of minor children in the City of Greenwood and in Leflore County, Mississippi, alleging in effect that said children are being deprived by the Greenwood Municipal Separate School District and the Leflore County School District of the equal protection of the laws; that I believe the complaints to be meritorious; that the signers of the complaints are unable, in my judgment, to initiate and maintain appropriate legal proceedings for relief; that the Boards of Trustees of the School Districts were notified of the complaints; and that in my judgment, the institution of this action a reasonable time to adjust the conditions alleged in the complaints; and that in my judgment, the institution of this action will materially further the orderly achievement of desegregation in public education.

This certificate is made pursuant to the provisions of 42 U.S.C. 2000c–6(a), in support of the complaint to which it is attached.

Signed this 28th day of July, 1966.

/s/ Nicholas deB. Katzenbach
NICHOLAS deB. KATZENBACH
Attorney General

Senator Humphrey, the floor manager of the bill in the Senate, added:

> The bill requires the Attorney General to state in his complaint that he has received a complaint and that in his judgment the persons who complained are unable to initiate or maintain appropriate legal proceedings. *These statements by the Attorney General will not be subject to challenge either by the defendants or by the court. Under no circumstances will the Attorney General be required to reveal the names of the particular complainants.* [110 Cong.Rec. 6543 (March 30, 1964) (Emphasis added).]

While conceding that this legislative history may preclude discovery of the complainants' names and make unassailable the assertion that they are unable to initiate and maintain legal proceedings for themselves, the school board contends that the nature of the complaints should nevertheless be discoverable. However, the portion of the House Report cited above conveys the broad implication that none of the determinations on which the Attorney General's certificate is based were intended to be reviewable. In order to assure the anonymity of the complaining Negro parents, Congress vested authority in the Attorney General to make a final determination as to whether the complaints he receives merit legal action, whether the complainants would be unable to initiate a suit themselves, and whether a suit would advance the desegregation of schools. Having issued a certificate in conformity with the statute, he acquires standing to sue. If it develops that no children in the school district are being denied equal protection of the laws, then no relief will be granted. This was the position taken by the court below and by another district court which considered the same question. See United States by Katzenbach v. Junction City School District, W.D.Ark.1966, 253 F.Supp. 766. We agree.

■ In urging that disclosure should have been required or else the suit dismissed, appellant points out that the Attorney General must certify that the school district has "had a reasonable time to adjust the conditions alleged in the complaints." How, queries counsel, can he truthfully make such an assertion when he has prevented the school district from even attempting to adjust conditions by refusing to disclose the names of the complainants and the nature of their complaints? If disclosure were required, the school board might be able to make proper adjustments and thus avoid an expensive, time-consuming lawsuit. The answer to this argument is that disclosure of the names of the complainants and the exact language of their complaints is unnecessary because the school board knows, has known since 1954, what Negro parents mean when they allege generally that their children are being denied equal protection of the laws. They mean that all-Negro schools yet exist, that faculties have not been integrated, and that other characteristics of the dual system remain. When the Attorney General certifies that in his opinion the school district has had a reasonable time to adjust the conditions complained of, he means simply that in all these years the school district has not made enough progress toward establishing a unitary nondiscriminatory system. The school board cannot adjust conditions and avoid the lawsuit by negotiating with the particular parents who have complained. Seeing their names and the precise language of their complaints will not give the board any information it cannot get by looking at conditions in the schools, specifically at the extent of desegregation of students, teachers, and activities. The progress of desegregation is what school cases are all about; the school board knows this and does not need to examine the complaints received by the Attorney General to know what is being charged. If the board is convinced the lawsuit is without redeeming merit, it can offer objective evidence to this effect. Again, we hold that the board has no right, nor have the courts any right, to examine the information which

triggered the Attorney General's certificate.[4]

We turn now to the school board's contention that the Government should not be heard to challenge the adequacy of freedom of choice when the model decree for freedom of choice was entered on its own motion. As the board says, the Government urged the adoption of the model decree for freedom of choice in the court below but now takes the position that freedom of choice should be abandoned in favor of some other attendance plan because it has not brought about an acceptable degree of integration. For the proposition that where freedom of choice has not worked it must give way to a different attendance plan, the Government relies on Supreme Court cases decided after the district court's decision in this case. See Monroe v. Board of Commissioners of City of Jackson, 1968, 391 U.S. 450, 88 S.Ct. 1700, 1701, 20 L.Ed.2d 733; Raney v. Board of Education of Gould School District, 1968, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727; Green v. County School Board of New Kent County, 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716.[5] As we understand the school board, it does not deny that its future litigation must be governed by *Green* and *Raney* but it does contend that on this appeal the Court is in no position to prescribe a particular attendance plan to replace freedom of choice. We agree that the posture of the case is such that we can-

not prescribe a particular plan to be implemented by the district court and the school board. But since the case is properly before us and since we must remand for reasons quite apart from the inadequacy of freedom of choice, we hasten to emphasize that on remand the proceedings must be controlled by *Green* and *Raney*, as well as recent Fifth Circuit decisions. Going a step further, we will express the view that these recent decisions foreclose the use of freedom of choice in *Greenwood* because it has produced so little in the way of meaningful desegregation. On remand, of course, the school board will have an opportunity to be heard as to the attendance plan it considers most desirable. It is our impression that in objecting to the Government's appeal from that part of the district court's decision granting the relief for which it asked, the school board is primarily concerned that it be given a hearing on the matter of the appropriate attendance plan before a decision is made. It does have a right to such a hearing.

*School Desegregation in Greenwood*

A. *Students.* Greenwood is a town of about 25,000 people with about as many Negroes as whites. In the 1967–68 school year, there were about 3,000 white students and 3,000 Negroes in the school system. There are five elementary schools, two junior high schools, and two senior highs. Under the plan

---

4. We have found no case holding that the Attorney General's suit is subject to a motion to dismiss where he refuses to disclose information underlying his certificate. However, in United States by Katzenbach v. School District Number 1, Lexington County, D.S.C.1966, 40 F.R.D. 391, a district court held that the names of the complainants and the nature of their complaints could be discovered in preparation for trial. Though the court agreed that such information is not discoverable on a motion to dismiss, we nevertheless have grave doubts about the decision for the reasons stated in the text of this opinion. Congress has clearly expressed its concern with assuring anonymity to the complainants, and

we cannot see how their names and the nature of their complaints can be essential to the school board's preparation for trial. The board has all necessary information about its schools in its own files or can readily obtain such information without having to see the complaints.

5. Prior to the Supreme Court decisions in *Green* and *Raney*, this Court made it clear that freedom of choice is not an end in itself, so that if it does not work, another attendance plan must be tried. Davis v. Board of School Commissioners of Mobile County, 5th Cir. 1968, 393 F.2d 690, 695; United States v. Jefferson County Board of Education, 5th Cir. 1967, 380 F.2d 385, 390.

**1092**

approved by the district court, attendance is based on freedom of choice in all of the schools but one. The one exception to the general pattern is a geographic zone approved for a white residential section in the north part of town. The zone is bounded on the north by the Tallahatchee River and on the south by the Yazoo River. It is connected with the main business district of Greenwood by three bridges crossing the Yazoo. All children of elementary school age who live in this residential district must attend the Bankston Elementary School; they cannot go elsewhere. All other schools in the system are south of the Yazoo so that junior and senior high school children who live in the zone are under the free-choice plan. Elementary school children who live south of the river, not in the zone, cannot go to Bankston. It is an all-white school, students and faculty.

The 1967–1968 figures for student enrollment indicate that of the eight schools operating under freedom of choice there were two all-Negro elementary schools, one all-white elementary school, one all-Negro junior high, and one all-Negro senior high. The three remaining schools (elementary, junior high, and senior high) were overwhelmingly white but had a total of 18 Negroes enrolled. Thus, only 18 Negroes, less than .6% of the Negro student population, experienced a desegregated education last year while the remainder attended all-Negro schools.[6] In the previous year, 1966–67, only 9 Negro students attended predominantly white schools in the free-choice area south of the Yazoo. As this Court said in a recent school desegregation case, "figures speak and when they do

courts listen." United States v. Board of Education of City of Bessemer, 5th Cir. 1968, 396 F.2d 44, 46. Looking at these enrollment figures for the two previous school years, we cannot escape the conclusion that freedom of choice has not been successful in bringing about a transition to a unitary nondiscriminatory school system. In holding that freedom of choice was an unacceptable attendance plan for New Kent County, Virginia, the Supreme Court in *Green* noted that after three years under freedom of choice 85% of the Negro children in the system still attended the all-Negro school. The statistical showing in Greenwood has been much worse; therefore freedom of choice must be abandoned in favor of some other plan that "promises realistically to work and promises realistically to work now." 88 S.Ct. at 1694. As we have said, we will not at this time dictate the plan to be used, but it is abundantly clear that freedom of choice cannot be used since it has not done the job that is constitutionally required, i. e., the job of converting a dual system into a unitary system in which the separate tracks for Negro and white students are no longer identifiable.

Although it is true that the Government asked for the freedom of choice decree and did not object to it until reaching the appellate level, it has objected all along to the geographic zone on which the district court placed its imprimatur. That zone covers an all-white residential district, and the Bankston Elementary School has always been an all-white school. In evaluating the school board's approach to school desegregation, we must pass on the validity of

6. The Government has included in its brief 1968–69 enrollment statistics which indicate that the number of Negroes enrolled in predominantly white schools has increased from 18 to 51 or from .6% to about 1.8% of the Negro students. These statistics also indicate that there are still two all-Negro elementary schools, one all-Negro junior high and one all-Negro senior high. The school board protests that these figures were compiled after the district court's decision in this case and therefore are not properly a part of the appellate record. The figures were in a report filed by the school board with the district court on June 1, 1968. We think we could properly consider a public record of this kind, but, at any rate, the figures for 1967–68 adequately portray the lack of desegregation under freedom of choice.

the Bankston zone as well as the validity of the freedom of choice plan that has governed students who must attend schools south of the Yazoo. The court below held that the board had drawn the most natural geographic zone imaginable: It is bounded by river on the north and south and, if elementary school children were to attend some school other than Bankston, they would have to go over a bridge and through the business section of town. We acknowledge that there is a rational basis for the geographic school zone in North Greenwood; moreover, we have previously held that in many instances geographic zoning offers both administrative improvement and greater desegregation. See Davis v. Board of School Commissioners of Mobile County, 5th Cir. 1968, 393 F.2d 690. However, geographic zoning, like any other attendance plan adopted by a school board in this Circuit, is acceptable only if it tends to disestablish rather than reinforce the dual system of segregated schools. In *Davis*, for example, we concurred in the school board's use of zoning but required the board to make a new effort to draw zone lines on a nonracial basis so that its plan would promote desegregation rather than perpetuate segregation. 393 F.2d at 694. In this case, the Bankston zone has never even had the potential of promoting desegregation because it covers an all-white residential section. Hence, that zone must be re-evaluated along with the freedom of choice provisions of the board's attendance plan.

Counsel for the school board argues that a geographic zone does not contravene the fourteenth amendment if it is drawn according to objective criteria and not along racial lines. This assessment of the equal protection clause as it applies to school desegregation fails to take into account the *affirmative duty* of school boards in this Circuit to abolish state-compelled educational segregation and establish in its place a unitary system. This affirmative duty was spelled out in *Jefferson* and reaffirmed in *Green* and *Raney*. In saying that

the board's attendance plan must fulfill its affirmative duty to desegregate, we do not mean that the Bankston School, standing alone, is constitutionally defective because it is all-white or that Negro children of elementary school age have a constitutional right to attend the Bankston School in particular. The problem is that neither the Bankston zone nor the freedom of choice plan for students attending the other eight schools has contributed to desegregation. The over-all plan is defective and must give way to something new.

We do not rule out geographic zones for Greenwood, nor do we say that the Bankston zone will not fit into a valid over-all plan. We do say that a new plan must be devised to eliminate the remaining, glaring vestige of a dual system: The continued existence of all-Negro schools with only a fraction of Negroes enrolled in white schools. It may be that district-wide, nonracial zone lines would accomplish full conversion to a unitary system by giving all Negro students a desegregated education. Or, if this should be deemed inadequate, the combination of geographic zones with a majority-to-minority transfer policy can be considered. There are various possibilities. See, e. g., Adams v. Mathews, 5th Cir. 1968, 403 F.2d 181; Board of Public Instruction of Duval County v. Braxton, 5th Cir. 1968, 402 F.2d 900. We leave initial determination to the district court.

B. *Faculty.* The record reflects that as of the beginning of the 1967–68 school year there were three white educators and one white nurse employed by all-Negro schools. This was the extent of faculty and staff desegregation in Greenwood. We understand that our decree will not be simple of compliance, but we must apply the same rule of law to Greenwood that we have applied to so many other school districts: The school board must put its shoulder to the wheel and assume the burden on integrating the faculty and staff of each school, including Bank-

ston.[7] The transformation to a unitary system will not come to pass until the board has balanced the faculty of each school so that no faculty is identifiable as being tailored for a heavy concentration of Negro or white students. *See, e. g.,* Montgomery County Board of Education v. Carr, 5th Cir. 1968, 400 F. 2d 1; United States v. Board of Education of City of Bessemer, 5th Cir. 1968, 396 F.2d 44; Davis v. Board of School Commissioners of Mobile County, *supra;* Stell v. Board of Public Education for City of Savannah, 5th Cir. 1967, 387 F.2d 486; United States v. Jefferson County Board of Education, *supra.* This ultimate goal of balancing each faculty so that it cannot be identified as tailored for students of a particular race must be reached by the start of the 1970–71 school year. United States v. Board of Education of City of Bessemer, *supra.* To assure compliance, it is evident that the district judge will have to impose interim targets and conduct subsequent hearings to determine what progress is being made.

 The school board protests that it is powerless to do what we ask because of state laws. Under these laws, the principal of each school is responsible for hiring his own teachers though the superintendent and school board must approve their contracts. Of course, one answer to the argument that state laws prevent the board from taking the necessary affirmative steps is that local teacher hiring statutes may not be interposed to frustrate a constitutional man-

date. United States v. Board of Education of City of Bessemer, 396 F.2d at 51. Moreover, it will not be inconsistent with the Mississippi statutes for the school board to withhold final approval of teacher contracts unless such contracts will help achieve teacher desegregation. This was the relief requested by the Government in the court below, but the court's final decree merely gave the board the option of withholding approval of contracts in order to achieve desegregation. The board's responsibility is not optional: It must withhold approval of contracts if necessary to achieve faculty desegregation.

 The board further protests that it cannot achieve faculty desegregation by transferring teachers to different schools because under state law teacher contracts are for specific schools, thus making the reassignment of a teacher a breach of contract. Again, however, a state law is invalid to the extent that it frustrates the implementation of a constitutional mandate. This is the position the board must take if it is faced with lawsuits brought by teachers who have been reassigned and are alleging breach of contract. But it is hoped that such confrontations can be avoided by cooperation on the part of teachers and by the recruiting and hiring of teachers with an eye toward faculty desegregation.

The judgment of the court below is reversed and the case remanded for further proceedings not inconsistent with this opinion.

---

7. Counsel suggests that Bankston Elementary School should not be subject to any faculty integration because it has an all-white student body as a result of a de facto housing pattern. Bankston, however, is part of a formerly de jure dual segregated school system. The school board has an affirmative duty to eradicate the effects of past discrimination in that system. As we have stressed before, a vitally important step toward

achieving this goal is the integration of each school's faculty so that no faculty will be identifiable as being tailored for a heavy concentration of white or Negro students. Thus, the faculty at Bankston, like the other faculties, must not be recognizable as being tailored for students of a particular race. The board cannot, by its failure to integrate the faculty, set the school up as a haven for white students.