Rebecca E. HENRY et al., Plaintiffs-Appellants-Cross-Appellees,

v.

The CLARKSDALE MUNICIPAL SEPARATE SCHOOL DISTRICT et al., Defendants-Appellees-Cross-Appellants.

No. 29165.

United States Court of Appeals,
Fifth Circuit.

Aug. 12, 1970.

Rehearing Denied and Rehearing En Banc Denied Oct. 5, 1970.

Melvyn R. Leventhal, Reuben V. Anderson, Fred L. Banks, Jr., Jackson, Miss., for plaintiffs-appellants-cross-appellees.

Other interested parties: Jerris Leonard, Asst. Atty. Gen., U. S. Dept. of Justice, Washington, D. C., Jack Greenberg, Norman Chachkin, New York City.

Semmes Luckett, Leon L. Porter, Jr., Clarksdale, Miss., Hardy Lott, Greenwood, Miss., for defendants-appellees-cross-appellants.

Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

■ Following the limited remand accomplished by our April 15, 1970 order in this school desegregation case, Henry, et al. v. Clarksdale Municipal Separate School District, et al., 5 Cir., 1970, 425 F.2d 698 (Clarksdale II) the district court conducted a hearing upon the Special Master's Report and the exceptions thereto on April 24 and on May 8, 1970, entered its findings of fact and conclusions of law in a memorandum opinion and order. Thereafter the supplemental record was filed in this Court and further briefs have been received from the parties under a court-imposed accelerated briefing schedule, under the procedures detailed in Part III of Singleton III (Singleton v. Jackson Municipal Separate School District, 5 Cir. 1969, 419 F.2d 1211). See Rule 2, F.R.App. Proc. Under extensions granted by the Court at the urgent requests of the parties the last brief was filed with the Clerk on July 22, 1970. The case is disposed of as an extraordinary matter upon consideration of the record and briefs. Singleton III, supra, and Rule 2, F.R. A.P.

The opening of the 1970–71 school term is less than a short month in the future. In order to meet the already overdue deadlines imposed by Alexander,[1] Singleton III, supra, and Carter[2] so that complete conversion of this district to a unitary school system[3] may be accomplished by the beginning of the new term, we must act with dispatch. Time limitations will require prompt action by the School Board under the stringent requirements of the district court upon our remand.

Our directions to the district court upon remand from the prior appeal of this matter, Henry v. Clarksdale Municipal Separate School District, 5 Cir. 1969, 409 F.2d 682 (Clarksdale I) were as follows:

" * * * the Board bears the burden of taking corrective action. An effective plan should produce desegregated faculties, staff, facilities, transportation, and school activities (such as athletics) along with integrated student bodies. If there are still all-Negro schools, or only a small fraction of Negroes enrolled in white schools, or no substantial integration of faculties and school activities then, as a matter of law, the existing plan fails to meet constitutional standards as established in Green and its companion cases. The board should consider redrawing its attendance-zone boundaries, incorporating a majority-to-minority transfer provision in its plan, closing all-Negro schools, consolidating and pairing schools, rotating principals, and taking other measures to overcome the defects of the present system. As to its attendance zones, zone boundaries or feeder patterns designed or used to perpetuate or promote segregation shall be discontinued, and such zone lines shall be redrawn, wherever feasible, to maximize desegregation or eliminate segregation. No zone boundaries or feeder patterns which maintain what is essentially a segregated school structure shall be used. Brax-

---

1. Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1966).

2. Carter v. West Feliciana School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970).

3. Of the six recognized criteria for eliminating the racial identification of schools: composition of student bodies, faculty, staff, transportation, extra-curricular activities and facilities, see Green v. County School Board of New Kent County, 1968,

391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (391 U.S. 435, 88 S.Ct. 1689, 20 L.Ed.2d 716) and further see Ellis v. Board of Public Instruction, Orange County, Florida, 5 Cir. 1970, 423 F.2d 203, 204, only composition of student bodies is involved in this appeal. The district is compact and furnishes no transportation as such. Elimination of duality as to faculty, staff, extra-curricular activities and facilties was accomplished by the district court's order of January 10, 1970.

ton v. Board of Public Instruction of Duval County, M.D.Fla.1967." 409 F. 2d at 689.

The district court's directions to its Special Master referred to him:

"the task of aiding the court to develop a new student desegregation plan applicable to all 12 grades of the Clarksdale Municipal Separate School District, effective for the school year beginning September 1970 and thereafter. Said plan must produce a unitary school system in which no child is effectively excluded from attending any school because of his race or color; and, to be constitutional, the plan must provide for no schools attended solely by Negro students and no formerly all-white schools attended only by a small number of Negro students; that is, there must not be 'white' schools or 'Negro' schools, but just schools".

These directions were clear.

But the Special Master by his report failed completely to follow them with respect to the elementary schools of the district. See column 3 of the tables collected in footnote 11, infra.

The district judge held a hearing on the Special Master's report, exceptions thereto and argument thereon. His decision of May 8, 1970, from which this appeal is taken, confirmed the Special Master's report and adopted the school plan proposed by it. This was error under our instructions on remand in Clarksdale I.

The Special Master was an educator, not a lawyer, but his testimony indicates that he read and interpreted *Ellis* [4] to permit complete disregard of our earlier express requirements with respect to the elementary schools of the Clarksdale Municipal School District. The district judge also gave undue weight to *Ellis* (perhaps because he misapprehended the significance of the Master's findings, see footnote 6, infra), with the result that he failed to follow our clear directions to him in Clarksdale I as well as the constitutional requirement already clearly present in the case as explicated by the Supreme Court in *Green* and further clarified in the interim by several decisions by this Court and by the Supreme Court.[5]

The plan recommended by the Special Master [6] did implement desegregation of the senior and junior high schools by proposing to make the former Clarksdale junior and senior high schools (formerly all white) into a single senior high school for the entire district, and by proposing to make Higgins junior and senior

4. Ellis v. Board of Public Instruction of Orange County, Florida, 5 Cir. 1970, 423 F.2d 203.

5. Among others are the following: Adams v. Mathews, 5 Cir. 1968, 403 F.2d 181; United States v. Indianola Separate School District, 5 Cir. 1969, 410 F.2d 626; Andrews v. City of Monroe, 5 Cir. 1970, 425 F.2d 1017; Alexander v. Holmes County, supra, footnote 1; Carter v. West Feliciana, supra, footnote 2; United States v. Hinds County Board of Education, 5 Cir. 1969, 417 F.2d 852.

6. The district court's opinion of May 8 notes that the Special Master was appointed under Rule 53 of the Federal Rules of Civil Procedure, and that "the findings of the Special Master as contained in his report, are binding upon the court as to all questions of fact unless such findings are clearly erroneous". On the other hand, the district court gave no such weight to the HEW plan, prepared by a team of three experts working more or less continuously for 7 days. The weight given the so-called Special Master's Report is erroneous, since it did not represent findings of fact on sworn testimony and evidence considered by the Master. The report of such a master is not governed by Rule 53. He was a school expert who gathered information and spoke to school authorities, personnel and patrons of the district. His function did not differ from that performed by the HEW team. Faced as the court was with an intransigent Board, the appointment of an independent expert to study the system and make recommendations was perhaps a practical necessity. We simply point out that his report was entitled to no greater weight because he was called a master. His report was of similar weight to the HEW report.

high schools (formerly all black) into a single junior high school for the whole district. It proposed to leave unchanged the totally (or nearly so) segregated elementary school program under the zoning system already disapproved by Clarksdale I and indeed by the district court's order of January 10, but now sought to be restored to acceptability and brought forward under the *Ellis* neighborhood school or geographical proximity or "equal distance zoning" label. No change with respect to the elementary schools of Clarksdale would occur except the nomenclature employed. The racial makeup of pupils attending the several elementary schools would continue exactly as before. The student bodies of Heidelberg, Kirkpatrick and Oakhurst elementary schools would continue all white, serving grades from 1 to 6, in the same neighborhoods as under the former school board plan. Similarly, Oliver, Myrtle Hall, Riverton, and Booker T. Washington elementary schools would continue all black in student body, each serving Negro students from its immediate environs.[7]

The sole change of any note as to the elementary schools is adoption of a majority-minority transfer policy. We approve this provision without reservation and direct that it be continued. However, much, much more must be accomplished by the September, 1970 school opening date in order to convert this district into a unitary system.

The result achieved and approved in Ellis v. Board of Public Instruction, Orange County, Florida, supra, represented this Court's appraisal of the maximum that could be accomplished in converting to a unitary system under the facts in that case. Orange County, Florida, is a countywide district including a heavily populated metropolitan core and numerous outlying smaller population centers. It involved 2913 teachers and a student population of 36,498 in junior and senior high schools, 43,822 in elementary schools and 2548 in vocational and special educational classes, for a total school population of 82,868. The maximum desegregation possible of accomplishment in such a school system as Orange County bears little relation to the factual situation in this case.

Here we deal with a compact district of four square miles whose boundaries are coterminous with the city limits of Clarksdale, containing a school population of about 5300, roughly 3169 blacks and 2106 whites, formerly housed in seven elementary schools, three junior high schools and two senior high schools. At its widest points, the district (and the city) measures about 2 miles north to south and about 4 miles east to west. Ellis has its place when it is properly applied,[8] but reliance upon it by the district judge in the situation here totally ignores the real key to *Ellis*, the strong caveat of footnote 7, 423 F.2d at page 408:

"7. Under the facts of this case, it happens that the school board's choice of a neighborhood assignment system is adequate to convert the Orange County school system from a dual to a unitary system. This decision does not preclude the employment of differing assignment methods in other school districts to bring about unitary systems. There are many variables in the student assignment approach necessary to bring about unitary school systems. *The answer in each case turns in the final analysis, as here, on all of the facts including those which are peculiar to the particular system.*" (Emphasis supplied)

---

7. Under the orginal school board plan 7 whites were attending Myrtle Hall whereas Dr. Murphy's plan indicates 5 will attend. The school board plan had 2 whites and 463 blacks attending Oliver, whereas Dr. Murphy's plan indicates no whites and 415 blacks will attend Oliver.

8. This panel on July 14 relied strongly on *Ellis* in Hightower, etc., et al. v. West, etc., et al., 5 Cir. 1970, 430 F.2d 552, involving the Fulton County, Georgia, school system outside the corporate limits of Atlanta, but a part of metropolitan Atlanta.

The size and physical makeup of the district here under consideration markedly resemble that of the City of Monroe, Louisiana, whose school plan was recently reviewed by this Court in Andrews, et al. v. City of Monroe, et al., 5 Cir. 1970, 425 F.2d 1017. Monroe is a larger city with a school population of about 11,000, made up of approximately 5750 white pupils and 5250 black pupils, with twelve elementary schools, three junior high schools and three senior high schools. But its pattern of all black and all white neighborhoods and physical barriers in the form of railways, highways and rivers is similar. In *Andrews*, after noting that *Ellis* "convinced the district court that the school board's plan was constitutionally permissible", we quoted from *Ellis* and continued:

> "However, we do not reject the School Board's plan solely on the ground that it does not fit the *Orange County* definition of a 'neighborhood' system. Even if, as presently constituted the plan were a true neighborhood plan, we would reject it because it fails to establish a unitary system. *Orange County* does not say that a 'neighborhood' system of student assignment per se is a unitary system. To the contrary, *Orange County* carefully pointed out:"

Here footnote 7 of *Ellis*, supra, was quoted in its entirety. The Andrews court continued:

> "The School Board contends adamantly that a dual system is eliminated by its plan because the zone lines were drawn geographically without regard to the race of the students within those lines. While such a system of student assignment may be less offensive than one which intentionally segregates students, it does not necessarily follow that it creates a unitary system. The Supreme Court has made it clear that school boards cannot avoid their responsibility to create a unitary system simply by resorting to non-discriminatory, geographical zoning where such zoning would be ineffective:

> 'In view of the situation found in New Kent County, where there is no residential segregation, the elimination of the dual school system and the establishment of a "unitary, non-racial system" could be readily achieved with a minimum of administrative difficulty by means of geographical zoning * * * [However] a geographical formula is not universally appropriate. * * *'

Green v. County School Board of New Kent County, 1968, 391 U.S. 430, 442 n. 6, 88 S.Ct. 1689, 1696 n. 6, 20 L.Ed. 2d 716 (quoting from Bowman v. County School Board, 4 Cir. 1967, 382 F.2d 326, concurring opinion).

"In this case, whether the School Board's plan is called a 'neighborhood' plan or a geographical zoning plan, it does not disestablish the dual system. The *Orange County* system encompassed both rural and urban areas, comprised a large land area, had a total of 98 schools, and had a racial ratio of students of approximately 82 per cent white—18 per cent black. The Monroe City system, on the other hand, encompasses an urban area only, comprises a relatively small land area, has a total of only 18 schools, and has a racial ratio of students of approximately 51 per cent white—49 per cent black. In view of these circumstances, we reject as facially invalid the School Board's plan, under which close to 85 per cent of the black elementary students would continue to attend four traditionally black schools, two of which remain all-black (Lincoln and Clark) and two of which remain nearly all-black (Carver and Berg Jones). The two elementary schools which would remain all-black would alone house about 66 per cent of the approximately 3000 black elementary students. Furthermore, the plan provides for Carroll Jr. and Carroll Sr. High Schools (traditionally black) to house approximately 77 per cent of the black secondary students in the system, while a student ratio of about

10 black to 1 white is maintained in those schools."

The disposition in *Andrews* was a limited remand for further study and findings by the district court as to the HEW plan and the board plan originally adopted by the district court (and later erroneously discarded by the lower court on the basis of the intervening decisions in Ellis v. Orange County, supra, and Bivins v. Bibb County Board of Education, 5 Cir. 1970, 424 F.2d 97).

Here as in other recent cases [9] following the tenor of Alexander v. Holmes County, supra, footnote 1, and Carter v. West Feliciana (supra, footnote 2) it is necessary to shift the burden from the standpoint of time for converting to a unitary system from a status of litigation to a status of *unitary operation pending litigation.*

The findings by the court below as to the unsoundness of the plan proposed by HEW would be of doubtful validity standing in isolation. In the context here present they are clearly, erroneous. The district court was faced with a constitutional imperative, the requirement that this school system be converted to a unitary system. The plan proposed by HEW, as the only plan in existence promising to "work now", must be put into effect as of the beginning in September of the 1970–71 school year. With this plan in operation, the district court may proceed to consider alterations and amendments to it, to the extent that they represent forward, not backward steps.[10]

Under the HEW plan integration of six of the seven elementary schools is achieved by superimposing pairing of grades upon existing zone boundaries. The HEW plan reverses the uses to which Clarksdale junior-senior and Higgins would be put: formerly white Clarksdale junior and senior high schools would be combined to form a citywide junior high school, grades 7 and 8; and the Higgins school (now junior and senior) would be combined with Oliver Elementary (across the street) to form a citywide senior high school composed of grades 9 through 12. Oliver Elementary would handle the ninth grade and the other three would be housed at the two adjacent buildings of the Higgins complex.

The restructuring of grades at the elementary level is as follows:

| School | Grades served under HEW proposal | Students' previous assignments |
| --- | --- | --- |
| Myrtle Hall | 1-2 | Oliver, Myrtle Hall and Oakhurst |
| Oakhurst | 4-6 | Myrtle Hall and Oakhurst |
| Oliver | (part of Higgins-Oliver Complex; closed as elementary school) | |
| Riverton Junior High (converted to elementary school) | 3-6 | Oakhurst and Myrtle Hall (grade 3 only); Oliver grades 3-6 |
| Heidelberg | 3-4 | Heidelberg, Kirkpatrick and Riverton elementary |
| Kirkpatrick | 5-6 | Heidelberg, Kirkpatrick and Riverton elementary |
| Riverton elementary [A 2645] | 1-2 | Heidelberg, Kirkpatrick and Riverton elementary |

9. For example, in addition to *Singleton III,* supra,, see Charles v. Ascension Parish School Board, 5 Cir. 1969, 421 F.2d 656; Williams v. Iberville Parish School Board, 5 Cir. 1969, 421 F.2d 161; Jones v. Caddo Parish School Board, 5 Cir. 1970, 421 F.2d 313; Boykins v. Fairfield Board of Education, 5 Cir. 1970, 421 F.2d 1330; United States v. Board of Education of Baldwin County, 5 Cir. 1970, 423 F.2d 1013.

10. For instance, whether the Clarksdale Junior-Senior High complex is ultimately the single high school and the former Higgins Junior-Senior High complex is ultimately the single Junior High School or their functions are reversed, may well be left to the School Board to determine. Also, rearrangements between schools zoned or clustered, as to which buildings serve which grades may be undertaken. The point is that changes which tend to permit lessened desegregation will not be permitted.

The table set out in the margin gives a comparison of the racial composition of student bodies for the eleven schools in the Clarksdale system under the School Board's original plan, under the HEW plan and under Dr. Murphy's plan.[11] The figures are taken from the Appendix to the plaintiffs-appellants' brief, and are apparently derived from reliable sources. Their accuracy is not question-

**RACIAL COMPOSITION OF STUDENT BODIES AND GRADE STRUCTURES UNDER PLANS OF DESEGREGATION BEFORE THE DISTRICT COURT**

*CLARKSDALE MUNICIPAL SEPARATE SCHOOL DISTRICT*

| Name of School | School Board's Plan | | | HEW PLAN | | | Dr. Murphy's Plan | | |
|---|---|---|---|---|---|---|---|---|---|
| | Grades | W. | B. | Grades | W. | B. | Grades | W. | B. |
| Heidelberg | 1-6 | 346 | 0 | 3-4 | 224 | 138 | 1-6 | 295 | 0 |
| Kirkpatrick | 1-6 | 379 | 0 | 5-6 | 223 | 115 | 1-6 | 326 | 0 |
| Oakhurst | 1-6 | 302 | 0 | 4-6 | 160 | 234 | 1-6 | 283 | 0 |
| Oliver | 1-6 | 2 | 463 | combined with Higgins | | | 1-6 | 0 | 415 |
| Myrtle Hall | 1-6 | 7 | 468 | 1-2 | 100 | 290 | 1-6 | 5 | 469 |
| Riverton Elem. | 1-6 | 0 | 424 | 1-2 | 266 | 155 | 1-6 | 0 | 404 |
| Washington | 1-6 | 0 | 517 | 1-6 | 0 | 517 | 1-6 | 0 | 458 |
| Riverton Jr. High School | 7-9 | 0 | 433 | 3-6 | 56 | 384 | 7 | 154 | 258 |
| Higgins Jr. - Sr. High School | 7-12 | 2 | 834 | 9-12 | 673 | 599 | 8-9 | 387 | 642 |
| Clarksdale Jr. High School | 7-9 | 585 | 0 | 7-8 | 387 | 642 | 10-12 | 535 | 537 |
| Clarksdale Sr. High School | 10-12 | 483 | 30 | combined with Clarksdale Jr. H. | | | combined with Clarksdale Jr. H. | | |
| TOTALS:- | | 2,106 | 3,169 | | 2,089 | 3,074 | | 1,985 | 3,183 |

[A 2646]

ed in the district's brief. Variance in totals is caused by time differences in collecting figures.

As the tables in footnote 11 demonstrate, the HEW plan accomplishes substantial desegregation at all of the schools of the system with the exception of Booker T. Washington Elementary and the roughly 500 Negro children who presently attend Washington. These children represent about 16%—17% of all the Negro pupils in the system, about 27%—28% of the blacks in elementary grades. Examination of the maps in evidence suggests the reason for Washington being a more difficult location to desegregate pupilwise. The Washington attendance area is circumscribed by rather formidable boundaries: the city limits to the south, the north-south railroad line to the east, Highway 61 to the north and the Sunflower River to the west. Additionally, between the school and the highway the area is heavily industrialized along the north-south railway tracks. All of these factors make it more difficult for children to enter the Washington area from the east or go out of it to the east. Study of the maps indicates that access into and out of the area to the north and west may be had by using Sunflower Avenue which parallels the river to the east of it. With pupils using this route the Washington school may possibly be combined into the Riverton-Oakhurst-Myrtle Hall cluster. Some other arrangement may be better. We leave this for determination by the district court under the leadership of the school board and HEW, with the help of the bi-racial committee required hereunder, infra. During the first semester of the 1970–71 school year studies as to the ultimate use of Washington and the Negro children presently assigned there should be undertaken as a high priority project so that these children may start receiving the benefits of a completely integrated education beginning with the second semester of the coming school year.

■ We have given careful attention to the criticisms of the district court in its May 8 order directed toward the HEW plan. Concededly the plan is not perfect, but its one paramount advantage outstrips and overcomes each of the criticisms leveled at it by the district judge: *it accomplishes desegregation of the Clarksdale Municipal Separate School District.* As the only plan now extant even approaching this goal, its adoption for the present at least is a must.

■■ The objections as to children being required to walk as much as two miles as opposed to an average of 0.5 miles heretofore, and of having to traverse natural or man-made barriers and the claim that a 2–2–2 grade division is somehow less desirable than a 1–6 division, all fail. The objections as to distance and crossing highways are covered by what we have said in *Clarksdale, I, Indianola,* supra, United States v. Greenwood Municipal Separate School District, 5 Cir. 1969, 406 F.2d 1086; Anthony, et al. v. Marshall County Board of Education, 5 Cir. 1969, 409 F.2d 1287; Board of Public Instruction, Duval County, Fla., v. Braxton, 5 Cir. 1968, 402 F.2d 900, and numerous other cases. Barriers which did not prevent enforced segregation in the past will not be held to prevent conversion to a full unitary system.

With respect to the objection of lack of "articulation" caused by the breakup of grade composition between two or more schools under zoning or clustering, it is sufficient to cite the breakdown required in a few of the southern Mississippi school districts covered by our consolidated cases reported as United States v. Hinds County School Board, et al., 5 Cir. 1969, 417 F.2d 852: Canton Municipal Separate District, 3–3–1–5; Columbia Municipal Separate School District, 2–3–2–5; Lawrence County, 4–4–4, 4–5–3; Meridian Municipal Separate District, 6–1–2–3; Natchez Special Municipal Separate District, 1–1–2–2–3–4; North Pike Consolidated District, 4–4–4; Quitman Consolidated District, 3–3–3–3,

and Yazoo Municipal Separate District, 2–1–2–1–3–3.[12] Clarksdale will fare no worse than the districts indicated.

Upon remand the district court is directed forthwith to see that a bi-racial committee of the type described in Ellis v. Orange County, supra, is established. The court is further directed to require that the bi-racial committee serve in an advisory capacity to the school board and to the court in the area of the promulgation and maintenance of zone lines in pairing or clustering problems and in school site location problems as they may arise, as well as in such areas as may appear appropriate from time to time. The aid of the bi-racial committee shall be sought in consideration of the ultimate utilization of Booker T. Washington Elementary School and the allocation of the pupils presently assigned there, discussed supra.

The school district cross-appealed from the January 10, 1970 order's disapproval of the plan submitted by it, urging that since its desegregation plan and geographic zoning was structured on a non-racial basis, it is constitutional regardless of the fact that only all-black and all-white schools resulted therefrom because of residential patterns in the community. Of course our prior mandate of March 1969 in Clarksdale I disposed of this on the basis of Green v. New Kent County, supra. The subsequent jurisprudence in this Circuit including the cases collected in footnote 5 to this opinion as well as what we have said above provides sufficient answer to this and similar contentions of the school district. As to all issues raised by the cross-appeal, we affirm the district court.

The time is short but the need is compelling. The orders of the district court of January 10, 1970 and May 8, 1970, as they apply to elementary schools are reversed and this cause is remanded to the district court with directions to take immediate action consistent with this opinion. Upon the cross-appeal of the school district the orders of the district court are affirmed.

The mandate shall issue forthwith. No stay will be granted pending petition for rehearing or application for certiorari.

Reversed and remanded as to principal appeal; affirmed as to cross-appeal.

COLEMAN, Circuit Judge (dissenting).

I respectfully dissent.

I feel that the decision of the majority is in direct conflict with the principles enunciated by Ellis v. Board of Public Instruction of Orange County, Florida, 5 Cir., 1970, 423 F.2d 203 [Judges Bell, Ainsworth, and Godbold].

As to the elementary grades at Clarksdale, the District Court entered an order which to the very last letter met the specifications of *Orange*. It was ordered that the elementary pupil should attend the school nearest his residence, regardless of zones and regardless of the present or previous racial enrollment of the school. It was further ordered that in case the capacity of the school should deny the attendance of any student, he should then attend the school next nearest his residence, regardless of any zone line, or present or previous racial enrollment of the school. The Court additionally ordered imposition of a majority to minority transfer policy, in which the transferring student was to be granted priority of space in the school to which he desired to transfer. This was a simon-pure *Orange* order.

In *Orange County*, supra, the Fifth Circuit approved the Constitutionality of a neighborhood assignment system, where the student must attend the nearest school, without exception and without variance, or, in the absence of available space, the student must attend the next nearest school in which space is available.

The Fifth Circuit stated that the majority to minority transfer provision under the leadership of the bi-racial com-

---

12. These figures are taken from reports to the Court filed April 15, 1970 as required

by this Court's order of March 30, 1970. United States v. Hinds County, supra.

mittee would be a tool to alleviate the all-Negro schools which resulted from residential patterns, 423 F.2d 208.

In a county in which the Negro pupils constituted only 18% of the total pupil population, the Court approved the neighborhood plan and, in doing so, it left three all-Negro schools in the Orange County system.

In rendering its decision in *Orange*, the Court did not say that the neighborhood school was Constitutional because Orange County contained a small Negro population or because Orange County was a big school district, with thousands of teachers and students. Obviously it could not have said so, because Constitutional principles applicable to one school district in the Fifth Circuit are bound to be equally applicable to any other school in that Circuit. If every child attends the school nearest his home and has a priority right to transfer to any other then he most certainly is not being denied the right to attend any school on account of race or color.

Now, the majority opinion in the case sub judice seeks to excuse its failure to follow *Orange County* by citing Footnote 7 to that decision. What Footnote 7 really said was that the decision does not "preclude the employment of differing assignment methods in other school districts". Of course not. That would have inescapably been true even if no footnote had been added.

It would be amazing indeed if after writing a full dress opinion Judges Bell, Ainsworth, and Godbold would have simultaneously reversed themselves (and their decision) in a fifteen line footnote. I reject such an illogical notion.

If a strict proximity neighborhood school system is Constitutional in Orange County, Florida, it is Constitutional in Clarksdale, Mississippi.

The fact of the matter is that with different panels of this Court handling different cases and with no en banc consideration of the problem permitted since our session of last November, some school districts are being allowed to retain as many as a dozen all black schools, generally because of residential patterns. The cases are in the books. I recognize the necessity for this and I approve of it. What I object to is giving some districts the benefit of such consideration and denying it to others whose problems are even more acute.

The plaintiffs in the Court below, so the record shows, attacked the Orange County decision as "an aberration". This Court en banc has never said so, and the only way legally to over-rule *Orange* would be by an en banc decision.

Here, however, the District Judge followed *Orange* to the last letter and for this he is to be reversed by two judges out of the fourteen on this Court. I shall request the Chief Judge to poll the Court on granting an en banc hearing in this case. It is public knowledge that an Orange County plan has been ordered by the District Court for the Southern District of Texas for the City of Houston, Texas, and that case is now on appeal to this Court. We may as well find out if the decision in Orange County became no more than a scrap of paper as soon as that county received the benefit of it.

I make that statement because the majority opinion holds that it makes no difference about children of elementary age (white and black) being required to walk two miles to school when they formerly walked only a half mile, and neither are the hazards to be taken into account. I seriously doubt that such a harsh rule has been imposed upon any other school district in the Fifth Circuit.

Here is what the District Court found about the hazards involved (and there is not a whisper that his findings are clearly erroneous):

"The record abounds with evidence showing the presence of such barriers, obstacles, and handicaps as two mainline elevated railroad tracks, a large channel of the Sunflower River with limited bridge crossings, resulting under-passes and over-passes, through-highways, and other special traffic conditions involved in traversing

Clarksdale's commercial and business center, with one contingent of younger children passing another contingent of younger children headed in opposite directions for the purpose of meeting their assignments at the paired grade schools. This is a far cry from conventional pairing of nearby schools of a rural school district previously served by a regular school transportation system (citing case). The overwhelming weight of the evidence in the case convinces this court that the instant pairing plan would produce great hardships, if not danger, to many school children from a purely physical standpoint, not to mention the undue burden it would cast upon school patrons" (typewritten memordandum opinion of the District Judge, pages 12 and 13).

It must be remembered that the children about to be subjected to these hazards are both black and white. It must be further remembered that any black child wishing of his own volition to incur such hazards is given that right by the judgment of the District Court, with absolute priority on the needed space, which is more than *Orange County* ordered, but which has crept into some of our subsequent decisions.

I must also point out that the conditions requiring the continuation of Booker T. Washington School are far more stringent than that existing in other places in the Circuit which were permitted to continue because there simply was no feasible method of desegregation. Various panels have left one school like that in Montgomery, Alabama, several in Fulton County, Georgia, several in Dade County, Florida, and a number, unknown to me, have not yet been disturbed in the City of Atlanta. Again, I am not complaining of what was done in these localities. It should have been done. I object to Clarksdale being denied similar treatment under what I am convinced are far more difficult circumstances.

I must further point out that the judgment of the Court below totally integrated 43% of the Negro population of the Clarksdale system in grades 7 to 12 and that the elementary pupils who would choose, if they could, to go to the schools nearest their homes would nevertheless inevitably finish the last five years of their public school careers in a totally integrated situation—when they are old enough to reasonably meet the hazards of walking all over the City if their parents are unable to provide private transportation. Again, it is common knowledge that it is the Negro pupil who most often cannot afford the private transportation.

Moreover, it is no answer to say that the District Court was bound inelastically to follow the terms of the former mandate in this case. The Fifth Circuit has uniformly held that as to cases sub judice the Courts must take into consideration supervening changes in case or statutory law. The cases are legion, and particularly in cases seeking to achieve unitary school systems.

I fully realize that racially dual school systems must be made unitary. The sooner that day arrives, if it ever does in the welter of conflicting Court decisions even in our own Circuit, the better for all children who must depend on public schools for a chance in life. I might add that the sooner it occurs the better it will be for the domestic tranquility of this Country.

My point is that the Fifth Circuit laid down one formula in *Orange*, but its use is not being uniformly permitted. The District Court, on the ground and more familiar with the facts than we shall ever be, held that the *Orange* method offered the best hope for Clarksdale. He did this in the face of objections from both the Clarksdale School Board and HEW. There presently exists no legal basis for a reversal. Moreover, if *Orange* had never taken its place in the judicial precedents, there would be no warrant for requiring, as here, that the hazards to little children should be of no consequence.

In the original *Brown* [Brown v. Board of Education of Topeka] cases, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) the Supreme Court stated:

"School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles. Because of their proximity to local conditions and the possible need for further hearings, the courts which originally heard these cases can best perform this judicial appraisal. Accordingly, we believe it appropriate to remand the cases to those courts.

"In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power.

"To that end, the courts may consider problems related to administration arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems."

This approach was entirely sound and I have no knowledge that the Supreme Court has ever modified it.

The District Judge has acted in accordance with these principles. He had a right to rely on our decision in the Orange County case. Under his judgment, the doors of every elementary school in Clarksdale are open to every child, regardless of race. Clarksdale is entitled to the same treatment accorded other school districts in this Circuit. The judgment of the District Court ought not to be reversed.

Again, I respectfully dissent.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is also DENIED.

For the reasons already stated in his original dissent, COLEMAN, Circuit Judge, dissents from the denial of a rehearing en banc.

CLARK, Circuit Judge (dissenting):

I respectfully dissent from the Court's action in refusing to grant in banc reconsideration of this case.

Rule 35 of the Federal Rules of Appellate Procedure governing in banc hearings provides that such rehearings ordinarily will not be ordered " \* \* \* *except* (1) when consideration by the full court is necessary to secure or maintain uniformity of its decisions, or (2) when the proceeding involves a question of exceptional importance." My dissent is based upon the premise that this case falls within both of the stated exceptions in Rule 35.

First, there is no rational legal basis upon which this opinion can consistently stand in uniformity with other decisions of this Circuit. As Judge Coleman's dissent points out, Clarksdale is legally indistinguishable from Ellis v. Bd. of Public Inst. of Orange County, Florida, 423 F.2d 203 (5th Cir. 1970).[1] This

---

1. In addition to what Judge Coleman states I cannot agree with the majority's view that *Ellis* decided that the neighborhood system permitted in Orange County repre-

case also violates every ordinary precedent of this Court, of the Supreme Court of the United States and Rule 52 of the Federal Rules of Civil Procedure defining the limited power of appellate courts to re-resolve fact issue decided by a district court.

Second, the decision we refuse to review is the result of processes, briefing, consideration and decision in this court premised on a basis that it is, in the words of the majority opinion, " * * an extraordinary matter." I agree—it is an extraordinary matter, and one of exceptional importance. It is more, much more, than one lawsuit. We are deciding on the separate educational future of more than 5,300 students. Our decisions affect the rights of the parents and relatives of each of them as well as the rights of several hundred teachers, staff and administrative personnel employed by the school system. It is hard to conceive of any case that could involve more important dimensions. Yet, under the manner in which it was decided, we haven't permitted the parties' normal briefing time, and counsel have been denied oral argument. The three judges in this court who participated in the making of this decision probably never conferred in person.[2] I seriously doubt any of them, particularly the majority, would claim any personal intimacy with the physical structures in or the actual geographic makeup of the Clarksdale School District. Notwith-

standing these circumstances, two judges of an appellate court override the deliberate judgment of a district judge and conclude:

* * * Concededly [the HEW Plan ordered into effect immediately] is not perfect, but its one paramount advantage outstrips and overcomes each of the criticisms leveled at it by the district judge: *it accomplishes desegration of the Clarksdale Municipal Separate School District.* As the only plan now extant even approaching this goal, its adoption for the present at least is a must.

The objections as to children being required to walk as much as two miles as opposed to an average of 0.5 miles heretofore, and of having to traverse natural or man-made barriers [rivers, railroads and highways] and the claim that a 2-2-2 grade division is somehow less desirable than a 1-6 division [long in use by the district] all fail. (Emphasis added by the Court.)

Here again our court misconceives the true end sought—it is not statistical integration of racial groups in school buildings but rather the protection of the equal right of all citizens to receive a viable public education. The problem is not to get the numbers "right". That kind of a problem could be solved by any mathematician. Preserving an environment for education of all citizens is the hard part, and the part in which we are now meeting with such small success.[3]

sented " * * * the maximum that could be accomplished" by way of numerical racial integration for that system. Obviously the Court could have required total racial balance and there were available options no more drastic than required in Clarksdale to eliminate Orange County's all black schools.

2. I intend not the slightest intimation of judicial impropriety by making these observations. The panel strictly followed the, now ordinary, extraordinary pattern adopted by this Court to expedite all "school cases."

3. As I write these words (August 31, 1970), news comes that the highly-regarded progressive superintendent of the

State's largest school system has found it physically necessary to resign less than two weeks before school was to start. He left with these words:

With deep regret I have found it necessary to request the Board of Trustees to accept my resignation as Superintendent of the Jackson Public Schools. As everyone is well aware the Jackson schools have been in a continuous series of litigation involving numerous court orders requiring the Superintendent to administer drastic changes. Professionally and personally I cannot continue as superintendent under the existing situation.

I regret that I cannot be involved in developing the outstanding school pro-

Perhaps the most convincing way to demonstrate the merit of granting in banc rehearing in this case is to simply, briefly set out the fact context involved in the six matters in which we have already granted pending in banc rehearings:

(1) Whether an individual was properly awarded a money judgment against a corporation.

Household Goods Carrier Bureau vs. Terrell vs. Aero Mayflower Transit Co. Inc., No. 25,989.

(2) Whether an oil well driller may sue a German ship and its owner in Florida.

Zapata Off-Shore Co. vs. M/S Bremen and Unterweser Ruderi GMBH, No. 27,497.

(3) Whether a person who has pled guilty to bank robbery and been sentenced to twenty years in the federal penitentiary must now be retried because he will not let his privately hired lawyer say that he told him the length of the maximum prison term that could be imposed if he pled guilty.

U. S. v. Woodall, Nos. 28,352 and 28,353.

(4) Whether a white man can challenge his conviction on the basis of the exclusion of Negroes from the juries which considered his case.

Salisbury v. Grimes, No. 27,179.

(5) Whether a person who has confessed to making moonshine whiskey should have his conviction reversed because the officer who stopped him as he was headed toward the illicit still took paper sacks from him that contained corks for the empty bottles at the still.

U. S. v. Brookings, No. 27,067.

(6) Whether the racial and ethnic composition of local draft boards is subject to challenge.

No. 28,295, Cortez v. Local Board

No. 28,356, Lopez v. Local Board

No. 28,113, Sumrall v. Kidd

No. 28,181 Evers v. Williams

No. 27,659, Smith v. Leach

This is not to assert that in banc consideration was improvidently granted in the cases listed above. I only state that if those cases are inbancworthy, *a fortiori* this cause merits the same treatment. It is past time for this largest of all the circuits to give face to face deliberation *as a court* to the multi-party, multi-faceted litigations we lump together in what we conveniently call school cases. I regret that we keep heaping "extraordinary" school case decisions on the district in this circuit without pausing to reflect upon the real efficacy of the ways used to meet the challenge these cases present.

---

gram that I am confident could exist in Jackson. I assumed the position of superintendent here to develop such a program. *Unremitting disruption has prevented the accomplishment of that objective.*

If we fail to get the poignant message of this last sentence, it just might become a part of the epitaph when courts are laid to rest with other institutions that have lost their relevance to society's changing demands.